RICARDO ENRIQUE RAFAEL RUBIO SACARELLO, ETC., Plaintiff and Appellant, *v.* ANTONIO A. ROIG, ETC., ET AL., Defendants and Appellees.

No. 12290. Decided January 4, 1962.

*Arturo O'Neill* for appellant. *Francisco González, Jr.,* for appellees.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On March 31, 1932, the former District Court of San Juan rendered judgment in an action for support brought by Carmen Sacarello against Ricardo Rubio-Ríos ordering the defendant to pay to the plaintiff a monthly allowance of $75

as of December 1, 1931.[1] The same court had sentenced Rubio on February 2, 1932 for abandonment of minors, consisting in that he did not provide support for his minor son, Ricardo Enrique Rubio-Sacarello, and sentenced him to serve 90 days' imprisonment in jail, but suspended the sentence on condition that the defendant deposit the sum of $50 monthly, commencing February 1932.[2]

By deed No. 37 of May 17, 1933, executed before Notary Pablo Andino-Espejo, Ricardo Rubio and Carmen Sacarello, after making reference to the aforesaid judgments, stated that "they have reached an agreement for a sum certain, to be secured by mortgage, for the support of Carmen Sacarello and of her minor son." To that end, Rubio recognized in favor of Mrs. Sacarello, "for her support and that of her minor son," the sum of $5,500, which he bound himself to pay within the period of one year, with interest thereon at the rate of 12 per cent annually, payable in monthly instalments as they became due. The executing party agreed to desist from the action for permanent support and to file a motion in the action for abandonment of minors, "stating under oath that the judgment had been executed and carried out as respects the allowance." In order to secure the payment of the principal sum of $5,500, interest thereon at the rate agreed upon, and a $500 credit for costs in the event of foreclosure, Rubio

---

[1] The claim was filed under the provisions of § 109 of the Civil Code, 1930 ed., which at the time of the judgment invested the court with power to allow support to the wife who obtained the divorce "out of the property belonging to the husband, which support could not exceed one third of the income therefrom." Subsequently, that section was amended by Act No. 90 of May 5, 1948 (Sess. Laws, p. 202, 31 L.P.R.A. § 385), in order that the support could be paid out of "the income, earnings, salary, or property of her divorced husband."

The evidence in the action for support disclosed that Rubio owned private property which yielded a net income of $264.76 monthly. We affirmed the judgment on appeal. *Sacarello* v. *Rubio*, 44 P.R.R. 860 (1933).

[2] This judgment was also affirmed on appeal. *People* v. *Rubio*, 44 P.R.R. 866 (1933).

constituted first voluntary mortgage in favor of Mrs. Saca-rello on his property situated in the wards of Antón Ruiz and Mambiche, of Humacao. It was further agreed that the mort-gagee would not claim any sum for costs within the afore-said civil action, since she would pay out of the "amount received" the costs incurred, including attorney's fees. It was also stated in the deed that Carmen Sacarello had re-ceived the sum of $275 which had been deposited with the clerk of the District Court of San Juan by way of allowance for the minor.

This deed was presented in the Registry of Property of Humacao and recorded by means of an entry which in its pertinent part reads as follows:

" ... And by virtue of the instrument object of this entry, the said Ricardo Rubio Ríos, of full age, divorced, property owner, and resident of Humacao, recognizes in favor of Carmen Sacarello, of full age, without any special profession, divorced, and a resident of San Juan, for her support and that of her minor child, the sum of $5,500, which he binds himself to pay within the period of one year counted as of May 17, 1933, with interest thereon at the rate of 12 per cent annually, payable monthly as it becomes due, until payment in full. The said Carmen Sacarello accepts the said amount and binds herself to desist from the action for permanent support and to file a motion in the case of The People of Puerto Rico versus Ricardo Rubio, for abandonment of minors, setting forth under oath that the judgment has been executed and carried out as respects the allowance, and further consenting to the annulment of the at-tachment on Rubio's property... It is expressly agreed that Mrs. Sacarello may not claim from Rubio any costs in the afore-said civil action, since she binds herself to pay the costs and the attorney's fees out of the amount received by her... Mrs. Sa-carello recognizes in favor of her attorney, Ricardo H. Blondet, a credit for $1,500, which amount comprises his attorney's fees in all the actions in which he has represented her, the costs paid by him, all the expenses, which she will pay to him when Rubio pays for the said mortgage..."

On August 1, 1933, Mrs. Sacarello and Lic. Blondet assigned the mortgage credit to Edmond Block,[3] including the monthly interest payment which had accrued as of July 18. Block instituted a summary proceeding for collection of the mortgage credit, and while only the judicial sale was pending he assigned it to Antonio A. Roig, who proceeded with the foreclosure which resulted in the adjudication in his favor of the mortgaged property. The assignments as well as the adjudication were timely recorded.

In January 1937, the brothers and sisters Enrique José, Ivette, and Margarita Amalia Rubio-González and Amalia González widow of Rubio, as heirs of Ricardo Rubio-Ríos, brought an action to revendicate the property foreclosed and adjudicated to Roig. Possessor Roig and Ricardo Enrique Rubio-Sacarello were joined as defendants, the latter having refused to appear as plaintiff. There was alleged the nullity of Roig's title based on the "nonexistence" of the mortgage credit which gave rise to the foreclosure, and which represented a compromise on "past and present support," and all of which appeared from the Registry of Property, thereby charging the subsequent acquirers with knowledge of these facts. Carmen Sacarello was summoned in her capacity as mother with patria potestas over her defendant minor child. Three years later Amalia González, personally and in behalf of her three plaintiff children, and Carmen Sacarello, in behalf of her minor son, Ricardo Rubio-Sacarello—sole and universal heirs of Ricardo Rubio-Ríos—filed a petition for authorization to compromise the action brought. The corresponding hearing having been held, the court granted the petition, and after defendant Roig deposited the sum of $2,000 for distribution among the aforesaid four minors, "Amalia González widow of Rubio and her children, the plaintiffs Rubio-González, and defendant Carmen Sacarello and her son, Ricardo Enrique

---

[3] In the dispositive portion of the deed of assignment it was stated that "Ricardo Rubio *recognizes that he owes* to the appearing party, Carmen Sacarello, the sum of $5,500."

Rafael Rubio-Sacarello, executed a waiver in favor of Antonio A. Roig, of any right, interest, and share which they may have in the property object of the litigation." It appears from the record of the said action that the sums deposited in favor of the minors were withdrawn upon motions made by their respective mothers in order to take care of their needs and to pay the attorney's fees.

Fifteen years later the four children of Ricardo Rubio-Ríos filed another action of revendication against Roig, setting forth substantially the same allegations as in the previous action, and also specifically challenging the validity of the compromise and of the judgment rendered in such action of revendication. The trial court dismissed the complaint and appeal was taken.

I

■ Article 1713 of the Civil Code, 1930 ed., 31 L.P.R.A. § 4825, provides that no compromise can be made with regard to future support. Scaevola [4] comments that this prohibition is reasonable "in view of the scope of the support, which is a right of successive performance, of changeable amount and consequences to the life or subsistence of the persons, with characteristics frequently of public interest." Castán [5] justified it on the ground that the right to life can not be renounced.

■■ According to the allegations of the plaintiffs, their own predecessor performed the act of compromise, as *supporter*, of future support and also the unlawful act of constituting a mortgage to secure the sum which he admittedly owed as a result of such compromise. Clearly, the plaintiffs seek to rely on the illegality of the acts performed by their predecessor to request the courts of justice to set aside all such acts. However, according to § 4 of the Civil Code, acts executed contrary to the provisions of law are void, 31

---

[4] XXVIII Q. Mucius Scaevola, *Código Civil* 346 (1953 ed.).

[5] 4 José Castán Tobeñas, *Derecho Civil Español, Común y Foral* 741 (8th ed. 1954).

L.P.R.A. § 4; *Sánchez* v. *Coll*, 69 P.R.R. 863 (1949) ; *Compañía Popular* v. *District Court*, 63 P.R.R. 116 (1944), but the author or participant of the illegal act can not appeal to the judge to demand its annulment. It is so provided in the maxim *nemo auditur suam turpitudinem allegans*, which is positively expressed in § § 1257 and 1258 of the Civil Code, 31 L.P.R.A. § § 3516 and 3517.[6] A similar prohibition applies to the successors and heirs of such author or participant, Judgments of the Supreme Court of Spain of March 9, 1900 (89 *Jur. Civ.* 347) and May 6, 1902, sale of reservable property made by the father to the detriment of his child (X *Jurisprudencia Referente al Código Civil* 552).

■ In referring to the identical provisions of the Spanish Code—§ § 1305 and 1306 of the Spanish Civil Code—

---

[6] The said sections read as follows:

"Section 1257.—[*When the nullity arises from the illegality of the consideration or the object of the contract.—If the fact constitutes a crime or misdemeanor common to both contracting parties.*] When the nullity arises from the illegality of the consideration or the object of the contract, if the fact constitutes a crime or misdemeanor common to both contracting parties, they shall have no action against each other and proceedings shall be instituted against them, and, furthermore, the things or sum which may have been the object of the contract shall be applied as prescribed in the Penal Code with regard to the goods or instruments of the crime or misdemeanor.

"[*If there is a crime or misdemeanor on the part of only one of the contracting parties.*]—This provision is applicable to the case in which there is a crime or misdemeanor on the part of only one of the contracting parties; but the one who is not guilty may recover what he may have given, and shall not be bound to fulfill what he may have promised.

"Section 1258.—[*If it does not constitute either a crime or misdemeanor.*]—If the fact of which the illicit consideration consists does not constitute either a crime or misdemeanor, the following rules shall be observed:

"[*When both parties are guilty.*]—1. When both parties are guilty, neither of them can recover what he may have given by virtue of the contract, nor claim the fulfilment of what the other party may have offered.

"[*When only one is guilty.*]—2. When only one of the contracting parties is guilty, he can not recover what he may have given by virtue of the contract, nor demand the fulfilment of what may have been offered him. The other party, who has had nothing to do with the illicit consideration, may reclaim what he may have given without being obliged to fulfill what he has offered."

Pérez and Aiguer [7] say "The party guilty of the illegality has no right and action at all: *nemo auditur suam turpitudinem allegans, nemo de improbitate sua consequitur actionem* (citations), which principles, if applied to the contract already executed, constitute a particular exception to the rule of radical nullity of the illegal compromise." Dualde [8] states that "The illegal consideration is not contractual consideration, so that the contract is frustrated in its generation. The conveyances carried out under these conditions are not subject to the general regime of the enrichment without consideration, but to the special regime of *nemo auditur* governed by § § 1305 and 1306. The contracting party who is not guilty of turpitude may exercise the *in rem verso*, or of enrichment without consideration, while the contracting party guilty of turpitude may neither claim nor demand the performance of the promise." Manresa [9] explains that although § 1306 refers to the consideration, "in view of the connection of the latter with the object and the analogy with § 1305," the same consequences apply to the considerations in which the illegality arises from the objective element of the contract. Castán, [10] Scaevola, [11] and Valverde [12] share the same view. See Ferrara, *El Negocio Jurídico* 502 *et seq.* (translated by Manuel Albaladejo). The case law of the Supreme Court of Spain is categorical in this respect. Thus, in its Judgment of November 11, 1895 (*Jurisprudencia del Código Civil* 584, 593) it declares that "even though under § 1302 of the Civil Code the action to annul contracts may be brought by any person principally or subsidiarily bound

[7] Notes in I-2 Ennecerus, Kipp and Wolff, *Tratado de Derecho Civil* 378 (1950 ed.).

[8] Joaquín Dualde, *Concepto de la Causa de los Contratos* 191 (Barcelona 1949).

[9] VIII José Ma. Manresa, *Comentarios al Código Civil Español* 717 (4th ed.).

[10] 3 José Castán Tobeñas, *op. cit.* 440.

[11] XX Q. Mucius Scaevola, *Código Civil* 1007 *et seq.* (1904).

[12] I Calixto Valverde y Valverde, *Tratado de Derecho Civil* 558 *et seq.*

thereby, this principle, which has its evolution in the following sections, has been modified in those cases in which the nullity arises from *turpis causa* or illegal consideration by § § 1305 and 1306, which deny to the guilty parties any action against each other, whether or not the act constitutes an offense or fault."

■■ Hardly one day ago we invoked the rule of *nemo auditur* in connection with a claim arising from a wager contract, and we refused to lend assistance to a party which demanded the fulfillment of the promise upon being favored in a raffle sponsored by the defendant. *Serra v. Salesian Society, ante,* p. 311; *cf. Saavedra v. Saavedra,* 46 P.R.R. 226, 227 (1934); *Fernández v. Laloma,* 56 P.R.R. 348, 360-61 (1940). And the fact is that one who makes use of his own turpitude does not deserve the protection of the courts. The lawmaker prefers to maintain the situation of fact resulting from the illegal act rather than give access to the courts to the request of annulment of the act contrary to law in which the plaintiff has been author or coparticipant.[13] *Possessiones melior condictio habetur.*

Assuming that the contract executed between the parties were one of compromise on future support which they guaranteed by constituting a mortgage, which was afterwards foreclosed and culminated in the adjudication of the mortgaged property in favor of defendant Roig, it is clear

---

[13] *Nemo auditur* is consecrated in American law in an identical manner and with identical effect. Citing Lord Mansfield, Williston says: "No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If from the plaintiff's own stating or otherwise the cause of action appears to arise *ex turpi causa* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; *not for the sake of the defendant,* but because they will not lend their aid to such a plaintiff." (V *Contracts* 4561, 1937 ed.). See, also, *Restatement, Contracts,* § 598; *United States v. Guy W. Capps, Inc.,* 204 F.2d 655, 660 (1953); *Kaiser-Frazer Corp. v. Otis & Co.,* 195 F.2d 838 (1952); *Brand v. Elledge,* 360 P.2d 213 (Ariz. 1961); *Kukla v. Perry,* 105 N.W.2d 176 (1960). Regarding the application of the same principle in Argentina, see I Salvat, *Derecho Civil Argentino* 65 *et seq.*

that there was "turpitude" in the initial act on the part of the predecessor of the plaintiffs. For that reason, his heirs are barred from claiming now and precisely invoking the act contrary to law in which their father himself was, if not the principal actor, at least its coparticipant. Moreover, one who owes security can not demand it.

## II

■ There is a further reason why the plaintiffs can not prevail, even assuming that the contract of compromise which gave rise to the mortgage contract were nonexistent. Having examined the registry record upon the presentation of the mortgage deed executed between Ricardo Rubio, predecessor of the plaintiffs, and Carmen Sacarello, the only conclusion is that defendant Roig is a third party protected against the action now sought, according to the provisions of art. 36 of the Mortgage Law, 30 L.P.R.A. § 61, in connection with art. 37 of the same Law, 30 L.P.R.A. § 62.

The said record refers to the fact that Rubio "recognizes in favor of Carmen Sacarello ... for her support and that of her minor child the sum of ... which he binds himself to pay within the period of one year ... which amount the said Carmen Sacarello accepts, binding herself to desist from the action for permanent support and to file a motion in the case of The People of Puerto Rico versus Ricardo Rubio, for abandonment of minors, setting forth under oath that the judgment has been executed and carried out as respects the allowance..." Nowhere in the entry recorded express reference is made to the fact that Carmen Sacarello or her minor son then waived their right to future support from the obligee. Only by way of interpretation, indeed quite constrained, may such fact be inferred from the portion copied above. The registry record is in fact more compatible with the version that the compromise involved support accrued up to the execution date.

■■ It is known that rescissory or resolutory actions "which owe their origin to causes which specifically appear in the registry" affect third parties, art. 37 *supra* of the Mortgage Law. *A contrario sensu*, when the cause of nullity is not stated explicitly, when it does not appear clearly from the registry, the third acquirer is fully protected by the record. In his outstanding treatise *Derecho Hipotecario*, Vol. I, p. 453 *et seq.* (1954 ed.), Roca Sastre states that the causes of nullity may appear in the registry either as "cause embodied in an entry, because it constitutes a circumstance which is part of or derived from the recorded act and is stated in the entry as an inherent element or authenticated reserve," or as "cause of an entry, because it gives rise to the latter's intention or is its principal object." As regards the former, "the destructive cause is naturally recorded or appears in the registry synchronically or simultaneously with the act object of such entry." And he adds:

"With respect to the causes embodied in an entry, the same shall appear clearly in the registry whenever they involve express and real *conditions* incorporated in the recorded act (for example, whenever the obligatory agreement or conventional redemption, etc., is stated in the sale). The same will be true in the case of causes arising from *reservations or warnings* clearly stated in the entry, whether they are stated in the title proper or appear from the record. On the other hand, such causes will not be so explicitly recorded whenever they are derived from the *integrating circumstances*, natural or agreed upon, of the act recorded, determinative of the nature and extent of the right recorded, which must necessarily be set forth in the registry according to art. 9 of the Mortgage Law, as well as whenever the *act or the supposition* which may give rise to a nullity or resolution (or rescission) is not set forth at all in the record."

It is fitting to refer here to the Judgment of December 30, 1944 (VIII *Jur. Civ.* 920, 2d series) which, in referring to an acquirer in good faith, declares that one who has sufficient knowledge of the causes which may invalidate the right of the transferor ceases to be such, but not so in the case of

one who "only finds himself in the presence of vague indicia which leads him at the most to suspect their existence." (At pp. 454–55.)

 We apply here the language employed in the opinion rendered in *Banco de Ponce* v. *Registrar*, 72 P.R.R. 123, 127 (1951), in which it was said that "the safety and certainty which must appear from the books of the registry regarding the condition of the title and encumbrances of recorded properties, and the transactions affecting them, can not suffer the entries therein to rest on suppositions or *constructions.*" Similarly, the causes which will undermine public faith in the record should not be left to arbitrary interpretations requiring specialized knowledge, but they must appear clearly from the registry itself, particularly in the case of causes embodied in an entry which were canvassed by the registrar without discovering the alleged cause of nullity. The statements made by the noted Puerto Rican mortgage-law commentator Mr. Justice Texidor, in his dissenting opinion in *Pérez* v. *Díaz*, 41 P.R.R. 345 (1930), who in referring to the causes which are explicitly set forth in the registry said, "so an examination by an attorney specialized in Mortgage Law is not contemplated; but only that any person of average education may see whether or not the cause or nullity appears from the registry." The defect or vice must be "reasonably apparent." *Ayllon et al.* v. *González et al.*, 28 P.R.R. 61, 69 (1920), *aff'd*, *Fernández & Bros.* v. *Ayllon y Ojeda*, 266 U.S. 144 (1924) ; *cf. Lizardi* v. *Caballero*, 65 P.R.R. 77 (1945) ; *Cruz* v. *Heirs of González*, 72 P.R.R. 291, 299 (1951) ; *Hernández* v. *Caraballo*, 74 P.R.R. 27 (1952) ; *Pérez* v. *Cancel*, 76 P.R.R. 625 (1954).

 After discussing the scope of the synonymy between appearing clearly and stating explicitly, Barrachina (I *Comentarios a la Ley Hipotecaria* 273, 1910 ed.), sums up in his commentaries the problem under consideration as follows:

"When there is lack of clarity and expression in the rescissory or resolutory causes which give rise to the actions of their respective names, aimed equally at invalidating the juridical act, the third party can not be prejudiced. Those causes must be stated in the record *concretely, conclusively, so as to dispel any doubt, in order to forestall any dangers and deceit which may inure to the contracting party in good faith; they must impress the senses, be self-evident, without the need of inferring or deducing them.* The third party must find that cause in the record, stated with such clarity and precision that he can not but admit it, necessarily surrendering to its forceful consequences; for although the ignorance of the law does not excuse compliance therewith, the study of causes which modify the *facultas agendi* and the appreciation of their scope is not the task of a layman having no knowledge of law, but of a person well-versed therein; and not everybody is a lawyer who can consult the registry books and determine whether from the history of the property, in the case of implied resolutory actions, the right of the person who conveyed or encumbered the recorded real property is extinguished in what cases and how." (Italics ours.)

 In view of the foregoing, we can not deny to defendant Roig the protection of the public faith in the registry. Since the cause of nullity does not appear explicitly, the action brought against him for the second time is untenable. It does not seem too late to recall, in general terms, that resort is had to the registry in search of protection and not prejudice.

## III

The trial court concluded that the $5,500 debt recognized by the predecessor of the plaintiffs, the payment of which was secured by the mortgage constituted on the property object of revendication, covered, among other things, allowances already accrued which may be freely compromised. It is necessary to examine the question in order to dispose adequately of this litigation.

Manresa, as well as the authors cited above, justify the prohibition to compromise future support "on powerful moral

reasons which can not be concealed," [14] namely, the reason already stated that a compromise on support "would amount to renouncing life in a way." He adds, however, that the prohibition does not extend to allowances accrued or due, because from their maturity date they become part of the patrimony of the person receiving the support, that is, that they constitute a credit which may be compromised. Scaevola [15] and Oyuelos [16] share the same view, the latter also basing his assertion on the language of § 1713, which refers only to future support, distinguishing it from past-due support. This author further states that the prohibition to compromise must be understood exclusively in connection with the essential, namely, the right to receive them, but not with the accidental, such as *the time to receive them*, from whom they are received, and the place to receive them."

 It having been established that the support accrued may be validly the object of compromise, we must now determine the scope of the prohibition of future support. Oyuelos asserts that § 1713 is the result of § 149, 31 L.P.R.A. § 568, which provides that the right to receive support "cannot be waived or transmitted to a third party," and that it is not subject to compensation. It will be noted that the latter provision refers exclusively to support between relatives, namely, those derived from the existing relationship between the parties, and that it does not include the support due the divorced wife. The fact is that upon incorporating § 1814 of the Spanish Civil Code—counterpart, we repeat, of § 1713 of Puerto Rico—it could not have been intended to comprise within its ambit the support of the divorced wife, since it is well known that our § 109, which consecrates the latter's right, has no counterpart in Spain, where divorce is not recognized as a cause for dissolution of the marriage, but it was taken from § 160 of the Civil Code of Lousiana, Dart,

[14] XII *Op. cit.* 107.
[15] XXVIII *Op. cit.* 107.
[16] VII Ricardo Oyuelos, *Digesto* 386 (1932 ed.).

La. Civil Code 102 (2d ed.).[17] That state has sanctioned the compromise of the divorced wife's right to receive alimony, *Abbott* v. *Abbott*, 5 So.2d 504 (La. 1941) ; *Brown* v. *Brown*, 153 So. 537 (1934).

It is interesting to note that Scaevola, in commenting that provision, cites Planiol and Ripert, who, in referring to the situation in France, says that "Those rules (prohibition of compromise on future support) apply to the support debt, properly speaking, recognized by law. But even the jurisprudence makes an exception *as respects the support due the wife in the event of divorce by the husband and father of his innocent and needy spouse:* in this case it convalidates and renders final any compromise freely consented to in connection with such support, adducing as ground that it has the character of indemnity of a quasi-offensive injury (extracontractual), and that the compromise for the reparation of an offense or quasi-offense is not prohibited at all." (At 349). In our opinion, the alimony of a divorced wife as innocent spouse in the action may be assimilated to the support due by virtue of an agreement or testamentary provision in connection with which there is no question that it can be compromised.[18] Cf. *Viera* v. *Heirs of Goitía*, 55 P.R.R. 291, 302 (1939) ; *Valdés* v. *Hastrup*, 64 P.R.R. 569 (1945). This being so, Mrs. Sacarello could validly compromise as **to** future support.

---

[17] We do not overlook the fact that according to § 151 of the Civil Code, 31 L.P.R.A. § 570, the provisions of Tit. VII, Book I, "are applicable to other cases in which by this code ... a right to support may arise." However, the same provision admits the exception in the event of agreement between the parties.

[18] Scaevola, *op. cit.* 346, asserts that the prohibition refers "to support due by command of the law itself, as it appears from § 143 *et seq.* of the Code or their equivalent, for if such support should arise only from the contract, we see no good reason why it could not be compromised ..." Laurent shares the same view, *Principios de Derecho Civil Francés*, vol. XXVIII, p. 399, 1900 ed. See, also, the Judgments of the Supreme Court of Spain of October 26, 1897 and November 10, 1948.

It remains to consider the problem relative to future support for the minor child. We can not hold that the oft-mentioned agreement covered such compromise (1) because there is no express statement to that effect; (2) nor had any civil action been brought in the name or for the benefit of the minor claiming support; and (3) the contract executed between the parties could only conceivably cover the support accrued up to the date the same was signed, as determined by the court as a condition for suspending the judgment rendered in the criminal action for abandonment of minors, in which the aggrieved party was The People. That is why the obligation assumed by Mrs. Sacarello as respects the judgment rendered in that proceeding was confined to the filing of a motion stating under oath that the judgment *has been executed and carried out as respects the support*. Clearly, it could only refer to the support accrued.

We need not discuss the question of res judicata in view of the conclusions made.

The judgment rendered by the Superior Court, Humacao Part, on February 18, 1957, will be affirmed.