KUKLA *v.* PERRY.

1. ATTORNEY AND CLIENT—GOOD FAITH.

The attorney who assumes the double position of purchaser and confidential legal adviser is bound to observe the utmost good faith towards the party with whom he is dealing.

REFERENCES FOR POINTS IN HEADNOTES

[1, 15, 16] 5 Am Jur, Attorneys at Law § 48.
[2] 5 Am Jur, Attorneys at Law § 46.
[3, 4] 5 Am Jur, Attorneys at Law § 139.
[5] 5 Am Jur, Attorneys at Law § 140.
[6] 12 Am Jur, Contracts §§ 209, 213.
[7–9] 12 Am Jur, Contracts §§ 220, 221.
[10] 5 Am Jur, Attorneys at Law § 169.
[11, 12] 5 Am Jur, Attorneys at Law § 123.
[13] 13 Am Jur, Corporations § 1001.
[14] 13 Am Jur, Corporations § 1040.
[17] 3 Am Jur, Appeal and Error § 1211.

2. Same—Skill—Loyalty—Fiduciary.

The attorney not only has duties of care and professional skill, but he must also conduct himself in a spirit of loyalty to his client, assuming a position of highest trust and confidence.

3. Same—Burden of Proof.

The burden is on the attorney to show full information and freedom from restraint on the part of the client in all dealings between the attorney and client.

4. Same—Evidence.

A transaction between an attorney and his client will be set aside if the attorney cannot produce evidence which puts the transaction beyond reasonable controversy or question.

5. Accounting—Evidence—Purchase of Corporate Stock.

Trial court's findings that defendant attorney had appropriated to himself corporate stock for which plaintiff and her son had ultimately given 2 real-estate and chattel mortgages to secure note given for purchase of such stock and as security for other loans and that defendant should account to plaintiff for sums paid on the note and for bonus thereon *held*, supported by evidence adduced in suit for accounting which showed there had been an overreaching on defendant's part which constituted a fraud upon all other parties concerned.

6. Contracts—Illegal Bargain.

A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover for the performance that he has rendered thereunder or its value.

7. Same—Illegal Consideration—Insurance.

Defendant attorney who exacted written promise from mortgagors to purchase their insurance in connection with their business from defendant's insurance agency, not being severable, so tainted the agreement as to render void the entire consideration he furnished and rendered promises involved in the agreement unenforceable (CL 1948, § 514.9a).

8. Same—Insurance—Illegal Contract.

A provision of a contract that is void by reason of statute prohibiting a creditor from insisting that debtor procure insurance from a particular insurance agent or insurer renders the entire contract void unless such provision is severable (CL 1948, § 514.9a).

9. Same—Consideration—Void in Whole if Void in Part.

If any part of a consideration is void the whole consideration is void as public policy will not permit a party to enforce a

promise which he has obtained by an illegal act or promise, although he may have connected with the act or promise another which is legal.

10. ACCOUNTING—ATTORNEY AND CLIENT—INCOME TAX SETTLEMENT.
   Defendant attorney in suit for accounting was properly required to repay to plaintiff with interest the entire amount over and above sum actually paid in settlement of claim for income tax, where plaintiff had given him $6,000 and only $1,610.40 had been paid, and the alleged contingent fee contract had not been filed with treasury department as required, the defendant not being entitled to any fee where he represented that the entire sum was for tax settlement.

11. SAME—RESCISSION—ATTORNEY'S SELF-DEALING WITH CORPORATE CLIENT.
   Provision of decree ordering rescission of contract whereby defendant attorney, as president, obligated defendant corporation to pay him rental on property hitherto purchased by the corporation and plaintiff notwithstanding cash loan made to corporation from plaintiff's relatives of more than sufficient to take care of corporate share of the contract *held,* not error in suit for accounting.

12. SAME—INVALID ASSIGNMENT—INTEREST.
   Interest, except upon amount defendant had expended to cure default on contract which he had caused to be assigned to himself, was properly disallowed by trial court on an invalid assignment made by defendant attorney to himself while president of defendant corporation when rescission of the transaction was ordered in suit for accounting.

13. CORPORATIONS—OFFICERS—DIRECTORS—CONTRACT WITH CORPORATION.
   A fiduciary relation exists between a corporation and its officers and directors and the latter may deal with the corporation only in good faith with all the material facts made known to the other directors, the burden of proving the fairness of any contract between a corporation and a director thereof is upon the party asserting its validity.

14. ACCOUNTING—OFFICERS—CORPORATIONS—SALARIES.
   Reimbursement of corporation by defendant attorney of entire salary he had voted himself after illegally acquiring control of the corporation involved in accounting suit by other stockholder *held,* proper, where defendant neither showed what the reasonable value of his services as president and treasurer would have been or that anyone else had participated in the decision to vote him a salary.

15. Same—Corporate Stock—Overreaching by Attorney.

> Shares of stock defendant attorney acquired from plaintiff for a token consideration are ordered returned to plaintiff in her suit for accounting without repayment of the consideration, where the circumstances of defendant's acquisition thereof involved an overreaching by defendant.

16. Attorney and Client—Overreaching.

> Overreaching by an attorney in his dealings with a client cannot be condoned.

17. Appeal and Error—Remand—Insufficient Appendix by Appellant.

> Remand to circuit court in chancery is ordered for purpose of ascertaining damages sustained by plaintiff-appellee due to appellant's failure to print a sufficient appendix and exhibits, where prayer for such relief is made by appellee (Court Rule No 70, § 5).

Appeal from Wayne; FitzGerald (Frank), J. Submitted January 14, 1960. (Docket No. 75, Calendar No. 47,887.) Decided September 16, 1960. Rehearing denied October 10, 1960.

Bill by Mary Kukla, formerly Mary Pabis, against Alexander P. Perry and West Dearborn Motor Sales, Inc., a Michigan corporation, for accounting, cancellation of certain financial transactions, and for corporate receivership. Decree for plaintiff. Defendants appeal. Appeal of corporate defendant dismissed for lack of prosecution. Affirmed as to individual defendant and remanded for determination of certain costs.

*Joseph H. McMicken* and *Michael J. Hand,* for plaintiff.

*Arthur C. Lumley (Charles H. King,* of counsel), for defendant Perry.

Smith, J. This is a suit in equity brought by the plaintiff, Mary Kukla, for various accountings by the defendant, Alexander P. Perry, for cancellation of various items of indebtedness and mortgages securing the same, and for placing in receivership

West Dearborn Motor Sales, Inc., control of which
had passed from her to the defendant. The defend-
ant has appealed from an adverse decree of the
chancellor.

The plaintiff was one of the incorporators of West
Dearborn Motor Sales, Inc., a Michigan corporation.
The other incorporators were Ernest Pabis, the
plaintiff's son, and Raymond Beeler. The original
subscribed capital was $2,000, consisting of 100
shares of common stock, of which the plaintiff held
50, Ernest 25, and Beeler 25. Late in 1945 Ernest
conceived the idea of entering the automobile sales
business and was introduced to the defendant by a
mutual acquaintance. Ernest sought the defendant
to assist him in procuring a loan to build the show-
room and establish the business. This the defend-
ant did by securing a building loan from the Guard-
ian Life Insurance Company.

Before proceeding further in our review of the
facts, a basic issue must be considered. This is the
nature of the relationship that existed between the
defendant and the plaintiff from the time of the
formation of West Dearborn Motor Sales, Inc.,
until it ceased doing business in 1954. The plaintiff
maintains that the defendant was during all this
period her attorney and counselor. This the de-
fendant denies, claiming, in brief, that "he was not
her attorney or the attorney for the corporation ex-
cept in connection with certain specific transactions,
and that he was not bound by the obligations of an at-
torney to his client when engaged in the various
financial transactions here."

The chancellor concluded that the defendant was
the attorney of the plaintiff and, later that of the
corporation, "from the first contact." He held, in
part, that:

"During all this time, the evidence is convincing
that the plaintiff considered defendant Perry to be

her attorney and also the attorney for West Dearborn Motor Sales, Inc., of which he also became an officer and director in January of 1948. There is no evidence that defendant Perry ever did anything to negative the idea that he was their attorney; that, in connection with any of his financial and insurance transactions with plaintiff and the corporation, he ever advised the plaintiff or her son, Ernest Pabis, that his interests might be adverse to theirs or those of the corporation and that independent advice should be sought or other counsel consulted."

We agree, as the chancellor stated, that this relationship "was fostered rather than abated by defendant Perry. It did not wink on and off, dependent on whether he was negotiating for them, drafting documents for them, giving them advice, selling insurance to them, or engaging in a financial transaction with them." The layman does not see the attorney remove his counselor's hat and don that of the insurance man, or the shrewd businessman, or the lender of money. The uninformed regard the attorney as just that especially when he is met in the same surroundings, regarding the same business transactions, and without any semblance of warning that he is anything but their counselor. As we have before stated, the attorney who assumes the double position of purchaser and confidential legal adviser is bound to observe the utmost good faith towards the party with whom he is dealing. *Payne* v. *Avery,* 21 Mich 524; *Coveney* v. *Pattullo,* 130 Mich 275. The attorney not only has duties of care and professional skill, but he must also conduct himself in a spirit of loyalty to his client, assuming a position of the highest trust and confidence. *Rippey* v. *Wilson,* 280 Mich 233. His position is not one "measured by the rule of dealing at arm's length." *Id.* at 243.

In addition to this, in all dealings between the attorney and the client, the burden is upon the attorney to show full information and freedom from restraint on the part of the client. If he cannot produce evidence which puts the transaction beyond reasonable controversy or question, it will be set aside and he will be held as a trustee for his client. *McIntosh* v. *Fixel,* 297 Mich 331. It is in this light that we must review the transactions which took place between the parties themselves and the corporation.

One of the first transactions was the formation of West Dearborn Motor Sales, Inc., preparation and filing of the articles of incorporation, preparation of the stock certificates and stock record, drafting the by-laws and minutes and related matters. Soon after this occurred the first transaction to be examined by us. In the fall of 1947, Beeler wished to leave the corporation and sought to dispose of his stock. The plaintiff and Ernest agreed to purchase his 25 shares for $35,000. In regard to financing this transaction, they consulted the defendant, who "thought it was outrageous, knowing the financial condition of the corporation and seeing the statements." The transaction was consummated, however, after the plaintiff and Ernest had given Beeler cash and automobiles amounting to $10,334. The balance of $24,666 was represented by a promissory note. The defendant agreed to lend this money to the plaintiff and Ernest but not by a direct loan. It was accomplished by a note executed by plaintiff and Ernest as makers and Beeler as payee, and by an agreement which contained a clause providing for the indorsement in blank by Beeler of his stock certificate. This note the defendant purchased from Beeler. The note and agreement were executed on June 10, 1948. It was on June 12th, however, that defendant paid Beeler the amount of the note and

also on that same day the stock certificate was indorsed. The certificate was kept by the defendant in his office, contrary to the agreement which provided that it be delivered to the plaintiff and Ernest.

Pending the purchase of this stock, the defendant was elected to Beeler's office in the corporation—vice-presidency. On January 5, 1949, defendant had 25 shares of stock of the corporation transferred on the stock records to himself. This stock "could only have been that originally held by Beeler." "There is no evidence that this was done as nominee for the plaintiff and Ernest Pabis; nor is there any evidence that it was by way of foreclosure of a pledge." For the moment, we will leave this transaction, to consider another closely related to it.

In December, 1949, the corporation was in need of working capital and, in addition, the plaintiff and Ernest were in default on their Beeler note, held by the defendant. The defendant agreed to rewrite the Beeler note to keep them out of default. A new note for $23,900 was executed by the plaintiff, Ernest, and the corporation. This figure was arrived at by deducting the 3 payments which had been made on the note and adding accrued interest. The new note was secured by 2 real mortgages, one on the corporation's property and one on a bar owned by plaintiff. In addition, a chattel mortgage was referred to in the note, but the defendant in his brief conceded that this is an error, for "no chattel mortgage was executed incident to this note."

On the same date the defendant issued to the plaintiff, Ernest, and the corporation, 2 checks in the amount of $10,000 and $8,000. In return the plaintiff, Ernest, and the corporation executed to the defendant a promissory note in the amount of $18,000. The plaintiff also executed 2 real mortgages, again on the property she owned on Michigan avenue on which the salesroom was situated, and on

the bar she owned. The corporation, in addition, executed a chattel mortgage on "all its property, including the business, good will, trade name, dealership franchise, leasehold interest in the Michigan avenue property, and all its stock, furniture, fixtures, tools and equipment." More regarding this chattel mortgage will appear later.

In scrutinizing the transaction involving the Beeler stock, the trial chancellor made a careful analysis of the conflicting and irreconcilable testimony, concluding as follows:

"From all the evidence presented, the court is convinced that Perry, from the date of the transfer, if not before, considered the stock his—at least, he so conducted himself in his dealings thereafter. The consideration therefor must have been at least satisfaction of the debt of the plaintiff and Ernest therefor, if not more.     *     *     *

"Further, to hold other than that Perry took the stock in satisfaction of the indebtedness for its purchase is to brand Perry a converter of the stock.

"This court cannot give credence to the implausible story of defendant Perry that the 25 shares were given to him as consideration for his forbearing to bring action to collect on the Beeler note, with the understanding they would pay when able to do so.     *     *     *

"If Perry's holding of the stock could be considered, originally, as a pledge thereof, the manner of its appropriation by him was a violation of the Michigan statute governing foreclosure of pledges. CL 1948, § 442.301 (Stat Ann 1959 Rev § 19.411). Unless the same be waived by agreement of the parties, a sale or disposition of pledged stock without notice to the pledgor and without a public sale is a conversion of the stock. *Feige* v. *Burt,* 118 Mich 243 (74 Am St Rep 390); *Wilkes* v. *Allegan Fruit & Produce Co.,* 233 Mich 215; *Holland Furnace Co.* v. *Allen* (CCA 6), 118 F2d 969.

"There was no pledge agreement covering these 25 shares of stock, hence no waiver contained therein; nor any other waiver shown of any statutory provision concerning it. The facts, as found by this court, are that the stock from Beeler was intercepted by Perry and kept by him, without any agreement or consent by the plaintiff to that effect. Later, as aforesaid, Perry had it transferred to his name and treated it at all times thereafter as his stock. The plaintiff and Ernest never did receive it.

"Accordingly, this court concludes and holds that there was no indebtedness to Perry to support the $23,900 note he obtained on December 22, 1949; and hence there was no basis for the purported mortgages exacted by Perry to secure payment of this nonexistent indebtedness."

Thus, the chancellor ordered cancellation of the note and mortgages and an accounting for the $3,000 received in partial payment of the note. The record amply supports such findings and there is no error therein.

We return to the instruments executed on December 22, 1949, relating to the $18,000 advance of working capital to the corporation. As part of this transaction the plaintiff, Ernest, and the corporation executed a promissory note for $18,000 to the defendant. In addition the plaintiff executed 2 mortgages on real estate owned by her. A chattel mortgage, previously described, was executed by the corporation. Although the loan was for $18,000, the chattel mortgage recited that it was securing $23,900, apparently to cover future insurance premiums. This chattel mortgage also contained the "following unusual covenant":

"It is further expressly agreed by the mortgagors, their heirs, executors or administrators, assigns and/or successors that they will cause the West Dearborn Motor Sales, Incorporated, to purchase all its insurance in connection with its business and

insure all installment sales contracts for fire, theft and collision originating from the business of West Dearborn Motor Sales, Inc., and/or as individuals, either directly or indirectly, during the term and life of this mortgage through the mortgagee, the said Alexander Perry; and it is also agreed that the West Dearborn Motor Sales, Inc., will submit proof to the mortgagee, his successors, or assigns, upon his request that there has been and continues to be a full compliance of this agreement; that a *failure* on the part of West Dearborn Motor Sales, Inc., and/or as individual or successors, *to fully comply with the said and within agreement shall be construed as a default in the terms and conditions hereof and shall be treated as in the case of any other default."* (Emphasis supplied.)

This clause, made by virtue of the emphasized portion an essential part of the chattel mortgage, was inserted in direct contravention of the following statute:*

"Henceforth it shall be illegal for any person, firm or corporation to require, as a condition precedent to the lending of money or extension of credit, or any renewal thereof, that the person to whom such money or credit is extended, or whose obligation said creditor is to acquire or finance, negotiate any policy or contract of insurance through a particular insurance agent or with a particular insurer. * * * Each violation of this section shall be a misdemeanor, punishable by a fine of not more than $100."

An additional factor should be observed with respect to this same transaction. At the time that the $18,000 loan was made, 2 checks were issued and part of the proceeds given to the corporation. The plaintiff charged that the defendant took back $3,000 of the money as a bonus for the loan; this was sub-

---

* CL 1948, § 514.9a (Stat Ann 1955 Cum Supp § 24.173[1]). For current similar law, see CLS 1956, § 500.2077 (Stat Ann 1957 Rev § 24.12077).

stantiated by the testimony of Ernest. The defendant denied the bonus. As between the conflicts in the testimony, however, the chancellor found that the plaintiff's version was the "correct one" and we are not persuaded that he was in error.

In summarizing his findings on this point the chancellor held:

"The court finds that the December 22d transactions were not arm's-length transactions. The court finds that, by use of his influence arising from the position of confidence and trust he enjoyed, defendant Perry obtained added security for the claimed indebtedness to him on the Beeler stock purchase. He did so by adding the corporation as an obligated party and securing the obligation by the chattel mortgage, which indebtedness, as later explained, the court is of the opinion no longer existed. Perry not only sought an unwarranted profit at the expense of the corporation (of which he was a stockholder and officer) by the bonus extracted on the $18,000 loan, but he did so at the expense of fellow stockholders and clients, to their detriment.

"The court concludes that the transactions were an overreaching by defendant Perry and constituted a fraud on all the other parties concerned, from which the plaintiff and the corporation are entitled to relief in this suit in equity."

Accordingly the court ordered the note and mortgages securing this loan to be canceled, and that the defendant account for all moneys received and credited against this indebtedness.

The defendant claims in this appeal that the $18,000 is subject to repayment since the promise to lend the sum is a lawful consideration, a separate and enforceable promise. The chancellor found otherwise. He held that:

"This agreement * * * was a part of the consideration for making the loan and cannot be sep-

arated from the whole transaction. The court finds that the transaction is not severable, as defendant Perry urges. If any part of such consideration is illegal, the entire consideration is void. *Nichols* v. *Waters,* 201 Mich 27; *LaFrance* v. *Cullen,* 196 Mich 726."

The agreement referred to, of course, is the illegal covenant extracted by the defendant, in the chattel mortgage securing this loan, to purchase insurance exclusively from his agency, the Alexander Perry Agency. The principles governing this problem are stated in the Restatement of Contracts:*

"A party to an illegal bargain can neither recover damages for breach thereof nor, by rescinding the bargain, recover the performance that he has rendered thereunder or its value, except as stated in §§ 599–609."

In this case none of the exceptions to this general rule will permit the defendant to recover. Certainly, having been an attorney and an insurance agent for some years, he was not ignorant of the illegal nature of the covenant. This is not a matter of slight illegality. Nor can the defendant claim that refusal to enforce or rescind the contract will be harmful to those for whose benefit the statute was enacted. Moreover, this is not an unessential illegal provision, for, as the chancellor found, the defendant by express provision made default in this provision of the same effect as any default in the mortgage. The only possible basis for the defendant's argument is in section 607 of the Restatement:†

"Except as this rule is qualified by the rules stated in §§ 578, 599–605, where any part of a bilateral bargain is illegal, no promise can be enforced unless not only that promise is legal but a corresponding

---

* 2 Restatement, Contracts, § 598.
  † 2 Restatement, Contracts, § 607 (emphasis supplied).

legal promise is, by the terms of the bargain, apportioned as consideration therefor, *nor even in that case if the illegal portion of the bargain is an essential part of it.*"

As has been noted, however, the chancellor found that this illegal covenant was an essential part of the mortgage and loan; that it was not severable. With this we agree, for it was a part of the entire plan of the defendant which was carried into effect on December 22d. The chancellor properly found that in these transactions the defendant was guilty of serious breach of his fiduciary duty, of overreaching, of an unwarranted profit at the expense of the corporation and its stockholders, of exacting an illegal covenant in the mortgage. That this covenant was an essential part of the loan to the corporation and the plaintiff cannot be seriously disputed. Thus the cases involving severable contracts (*e.g., Eastern Distributing Corp.* v. *Lightstone,* 257 Mich 184) are not in point. Rather the rule is as stated in *Nichols* v. *Waters,* 201 Mich 27, 38:

"If the void agreement not to settle without consent of the attorneys was a part of the consideration for the whole contract, or otherwise inseparably related to, modified or contaminated its other provisions so that with that provision stricken out the remainder could not stand as it read, a distinct, valid and enforceable contract, then it was not a divisible contract, the illegality of the objectionable clause permeated and vitiated it in its entirety and rendered the whole contract void."

Unless separable, of course, the contract is rendered void by the statute even though the statute does not expressly so provide. *Groves* v. *Jones,* 252 Mich 446; *In re Reidy's Estate,* 164 Mich 167. In this situation, we have consistently held that where an illegal contract is involved, the court will not enforce it or grant relief thereunder, particularly

where it is not the innocent party that is pleading to the court. See *Groves* v. *Jones, supra; Cook* v. *Wolverine Stockyards Co.,* 344 Mich 207; and cases cited therein. Our position may be best summarized by the following excerpt from *McNamara* v. *Gargett,* 68 Mich 454, 462 (13 Am St Rep 355):

"It is said, however, that Gargett received 25 bushels of oats, and ought not to be permitted to complain, as there is not a total failure of consideration. But the trouble is, the whole contract is tainted and avoided by the part of the consideration which is illegal. If any part of a consideration is illegal, the whole consideration is void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or promise, although he may have connected with the act or promise another which is legal. 1 Parsons, Contracts, p 457; *Snyder* v. *Willey,* 33 Mich 483, 496."

The chancellor ordered the defendant to account to the plaintiff and the corporation for moneys received incident to these transactions. We find that this under the circumstances is amply justified.

There are several matters remaining which the defendant has brought before us for review, but in none of them has he presented a meritorious claim. The first involves a fee charged by the defendant as an attorney for the handling of an income tax matter for the plaintiff. In 1948 the plaintiff's personal income tax returns for the years 1943 through 1947 came under scrutiny. It was defendants' testimony that "the special agent demanded from them $20,000" for additional income tax, and a penalty for fraud. This additional tax, defendant testified was based upon higher mark-ups (for example, 120% in certain years) and net worth. The demand for such sum, upon such theory, was said never to have been made in writing, and it was more than a coincidence, plaintiff asserts, that $20,000 is the approximate increase

in income (not income tax) resulting from the application of 120% mark-up for the years 1946, 1947, and 1948. The audit changes, however, relate not to mark-ups, or fraud, but to disallowance of items of advertising, automobile expense, and depreciation. At the time the alleged settlement was made, plaintiff executed in favor of defendant 3 notes, each for $2,000, a total of $6,000. Defendant testified these notes were to cover the $1,610.40 tax liability plus his fee. There is, we will note, testimony from Ernest Pabis that at a later date defendant had told him the entire $6,000 was for tax settlement, and Mrs. Pabis herself testified that she paid $6,000 to Mr. Perry for the government by check, thus paying off the notes.

As between the conflicting versions of this matter, and the conflicting interpretations of exhibits, we are unable to conclude that the chancellor was in error. We note that the alleged contingent fee contract was not filed with the treasury department, as was required,* nor was there a statement submitted for service rendered in plaintiff's behalf, nor any receipt tendered the court for fee paid. We are constrained to agree with the chancellor that—

"the conduct of defendant Perry in this matter did not measure up to the standard required of an attorney toward his client. By such conduct, an attorney may lose his right to any fee. *Rippey* v. *Wilson*, 280 Mich 233, 245. This is the position in which the Court holds defendant Perry placed himself. Accordingly, it is the conclusion of the Court that defendant Perry be required to account for and repay to the plaintiff the $4,399.60 claimed as a fee in this tax matter, together with interest."

---

* Treasury Department Circular No. 230 (Revised), § 10.2(y)(3), 1947-2 Cum Bull, p 293, revised by Rev Proc 59-3, 1959-1 Cum Bull, p 801, § 4.06, pp 803, 804 and supplemented by Rev Proc 59-16, 1959-1 Cum Bull, pp 825, 826.

In November, 1954, two relatives of the plaintiff, Gertrude Pabis and Genevieve Pabis, were ready to put $20,000 into the business to help it recuperate since it was experiencing difficulty in securing a floor-planning arrangement. The defendant, however, refused to participate any further since, he maintained, new floor-planning would require his personal guaranty; therefore, he desired control of the corporation. The plaintiff, who wished to go to Florida, transferred to the defendant 35 of her shares, giving him now 60 shares or 60% of the stock. For this the defendant credited the plaintiff with $350 on her indebtedness. Having thus secured control, the defendant procured his election as president and treasurer of the corporation.

In August, 1951, the corporation had found it necessary to acquire adjoining property to provide easy access to the service portion of its sales and service building and for the display of used cars. Dr. Kadlubowski had agreed to purchase the property and resell it to the corporation, the plaintiff, and Ernest on land contract. In 1954 the corporation was in arrears to the extent of 4 months in their payments. Ostensibly to secure this land contract from foreclosure and preserve it for the corporation, the defendant, on November 15th, shortly after he took control, assigned to himself the corporation's interest for $5,648. He also paid to the doctor the amount, $880, necessary to make the payments current and correct the default. The defendant then leased the property to the corporation for $150 per month (while its land contract payments had been $220 per month). Yet on November 17, 1954, Gertrude and Genevieve transferred their $20,000, providing additional capital, which was used to pay off old bills amounting to some "eleven or twelve thousand dollars." It was the conclusion of the chancellor that the defendant had not sustained his burden of prov-

ing the fairness of the above-described transaction and ordered rescission thereof. In this we find no error.

Of the findings regarding these transactions, the defendant does not complain of the order of the chancellor that the assignment of the Kadlubowski land contract be rescinded and the defendant be reimbursed, with interest, for $880 expended to cure the default in the contract and, without interest, for the $5,648 paid to the corporation for its equity. The defendant does, however, claim interest on the latter sum. The chancellor denied interest since it was an "invalid assignment." With this we cannot disagree, for the same reasons that the chancellor ordered the defendant to reimburse the corporation for the salary which he voted himself. We quote briefly from his opinion regarding the land contract transaction and the payment to him of salary by the corporation:

"A fiduciary relation exists between a corporation and its officers and directors. The latter may deal with the corporation only in good faith, with all the material facts made known to the other directors. *Barber* v. *Kolowich*, 283 Mich 97, 104; *Baker* v. *Hellner Realty Co.*, 265 Mich 625, 631. Further, when questioned, the burden of proving the fairness of any contract between a corporation and a director thereof is upon the party asserting its validity. CLS 1956, § 450.13 (Stat Ann 1959 Cum Supp § 21.13).

"This court is of the opinion that defendant Perry has not sustained this burden. Again, this does not represent an arm's-length transaction. * * *

"This purported ownership of the majority of the stock of West Dearborn Motor Sales, Inc., did enable Perry to make himself the president and the treasurer of the corporation. As a result of this control, he was able to provide himself with a salary from the corporation. Not only was this salary traceable to an improper act by which he enabled himself to

obtain it, but it is further subject to attack because it was, in effect, voted to himself by himself, with no showing that anyone else participated in the decision. *McKey* v. *Swenson*, 232 Mich 505, 513–515. Defendant Perry made no showing as to what, if anything, would have been a reasonable salary for his services as president and treasurer."

The chancellor also properly ordered the return to the plaintiff of the 35 shares which defendant secured from her in November, 1954, in return for the repayment to him of the "token consideration" of $350.

To summarize, we will again quote from the chancellor's careful and extensive opinion, his concluding paragraphs fully treating the fundamental question:

"Speaking in general, it is patent that this litigation involves more than mere money and material things. It also involves the relation that must be required and protected between members of the Bar and the public.

"In no manner or way or to the least extent can an overreaching by an attorney in his dealings with a client be condoned. It may be said that almost every private transaction, as distinguished from professional representation, between an attorney and a client presents the possibility of overreaching by the attorney. While not *per se* illegal, every such transaction places the integrity of the Bar as a body in jeopardy. Accordingly, every such transaction must be scrutinized closely, and each is fraught with danger to the attorney involved.

"Herein, the whole evidence presents clearly, and without doubt, an overreaching by an attorney in his dealings with his clients. Whether it was born of a plan, from the start, to profit personally at the expense and injury of the clients, the court need not say. To point to the result that was unfolding is ample to illustrate the evil thereof. While serving as their attorney, defendant Perry was about to con-

clude the saga vested personally with ownership of stock control of the corporation, with the physical property of the corporation, and with the real property of the plaintiff, both the Michigan avenue and the DeSoto Bar properties—in short, with practically everything owned by the plaintiff and the corporation. This is not compatible with the concern for their well being the clients were entitled to expect and demand from one who undertook to represent them as their attorney."

The decree of the chancellor required further accountings between the parties. At that time a proper determination may be made, as well, concerning the funds which the defendant expended in connection with the Kadlubowski land contract.

The decree is affirmed, with costs to appellee. The appeal of West Dearborn Motor Sales, Inc., not prosecuted in this Court, is dismissed.

It is further prayed by appellee—

"that she be awarded the costs of this court and attorney fees, including costs of printing the appellee's appendix and punitive damages for appellant's failure to print a sufficient appendix and exhibits to fairly present the entire controversy."

For the purpose of making recommendations to this Court upon such prayer, the case is remanded to the circuit court in chancery.* See *Greenough* v. *Greenough,* 354 Mich 508.

DETHMERS, C. J., and CARR, KELLY, BLACK, EDWARDS, and KAVANAGH, JJ., concurred.

SOURIS, J., did not sit.

---

* See Court Rule No 70, § 5. 347 Mich xxx.—REPORTER.