**John KLUKAVY and Theodore Fitzgerald, Jr., Plaintiffs,**

**v.**

**UNITED NATIONAL INSURANCE COMPANY, Defendant.**

**LAFAYETTE–ORLEANS, INC., Plaintiff,**

**v.**

**UNITED NATIONAL INSURANCE COMPANY, Defendant.**

Civ. Nos. 84–5051, 85–70760.

United States District Court, E.D. Michigan, S.D.

July 13, 1989.

Robert A. Nersesian, Birmingham, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

These actions arise from a dispute over entitlement to payment by United National Insurance Company of the proceeds of a fire insurance policy after the destruction by fire of a bar in Detroit, Michigan, which was known as "The Perfect Blend." At the time of the fire, the bar was operated by John Klukavy and Theodore Fitzgerald. A purchase agreement for the sale of the business had been executed by Lafayette–Orleans, Inc. (Lafayette–Orleans), the seller, and T.R.F.J., Inc. (T.R.F.J.), the buyer: a Michigan corporation of which Klukavy & Fitzgerald were officers, directors, and sole shareholders. Following the fire, both Lafayette–Orleans, as well as Klukavy & Fitzgerald, claimed entitlement to the insurance proceeds, and each instituted an action against United National to that end.

In addition, Klukavy & Fitzgerald alleged in a second count of their complaint a claim of account against Lafayette–Orleans, premised upon a management agreement with Lafayette–Orleans pursuant to which they had operated the bar under the name, "The Perfect Blend." Under the management agreement Lafayette–Orleans had engaged Klukavy & Fitzgerald as managers of the establishment and Klukavy & Fitzgerald were to make available $30,000 as a "loan or advance to Lafayette–Orleans, Inc. for improvements to the establishment, and the payment of current obligations."

The two suits for the fire insurance were consolidated and United National filed a motion for interpleader. Subsequently, a stipulation and order was entered dismissing the insurer from the case following its payment of the proceeds of the policy into an interestbearing account for disbursement only upon order of the court. The remaining claims were the seller's and the

Donald J. Gasiorek, Southfield, Mich., for plaintiffs.

purchaser's cross claims against each other for the deposited funds, as well as Klukavy & Fitzgerald's claim of account premised on the management agreement.

Lafayette–Orleans moved for summary judgment on the insurance claim, and after oral argument, this Court granted Lafayette–Orleans' motion from the bench on January 12, 1987, followed by a written Memorandum Opinion and Order issued on February 26, 1987.

In granting summary judgment to Lafayette–Orleans on the cross-claims for the insurance proceeds, this Court held that while Klukavy & Fitzgerald claimed to be the real parties in interest with respect to the purchase agreement between their corporation, T.R.F.J., and Lafayette–Orleans, in fact they had no cause of action as owners with respect to the insurance proceeds because it was the corporation which was to have been the purchaser of the property. The Court rejected their "alter ego" argument as contrary to established theory of independent corporation existence.

The Court further held that the addition of T.R.F.J. as a party to the litigation would be futile, noting that while T.R.F.J. had the character of a contract purchaser at one time, it had no such interest at the time of the fire because an essential precondition for transfer of the business, approval of the transfer of the Class C liquor license by the Michigan Liquor Control Commission, had never occurred. Indeed, the liquor license transfer had been denied, shortly before the fire. The Court further found that T.R.F.J. had abandoned its application for transfer of the liquor license, thereby rescinding the sale contract and leaving Lafayette–Orleans, Inc., as the sole owner of the property.

Finally, the Court concluded that Klukavy & Fitzgerald had no cognizable claim to the insurance proceeds under the management agreement, because the management agreement was an illegal contract and had been so determined by the Michigan Liquor Control Commission. The Court also noted that Klukavy & Fitzgerald admitted the illegality of the management agreement, as part of a settlement resolving a 1983 complaint filed by the Liquor Control Commission.

Klukavy & Fitzgerald argued that, even if the management agreement was partially tainted by illegality, they should be permitted to sever the illegal provisions and maintain an action for reimbursement of the $30,000 loan which they claim to have made, and for payment to Klukavy & Fitzgerald of the minimum wage for their many hours worked, as well as five percent of the establishment's gross profits during their period of management.

This Court rejected that argument, finding that the illegal provision of the management agreement vitiated the entire agreement, rendering it unenforceable. See this Court's opinion in *Klukavy v. United National Insurance Company*, 654 F.Supp. 622 (E.D.Mich.1987).

Fitzgerald & Klukavy appealed the Court's ruling to the United States Court of Appeals for the Sixth Circuit, which affirmed this court's entry of summary judgment for Lafayette–Orleans on the insurance claims, but reversed on the claim of account premised upon the $30,000 allegedly advanced or loaned under the terms of an agreement between the parties. 848 F.2d 191.

Previously, this court had held that the advances were so "intertwined" with an illegal management agreement for a liquor-serving establishment that any claim of account based upon those advances was unenforceable. Plaintiffs now claim that the $30,000 which they seek was loaned or advanced pursuant to the purchase agreement, and *not* the illegal management agreement.

The Sixth Circuit has reversed and remanded for trial on the claim of account for $30,000:

> ... to determine whether the loan was an independent transaction or one designed to provide plaintiffs with an interest in or benefit from defendant's liquor license.

The Sixth Circuit noted that the record before it did not disclose "the precise terms and conditions" attached to the loan, and that:

It is possible that the "improvements" and "obligations" covered by the loan were not related to the liquor license. Additionally, it is possible that the loan was not an integral basis for the parties' decision to enter into the illegal management agreement.

Trial on this issue was held on April 11, 1989, and this memorandum constitutes the Court's findings of fact and conclusions of law on this issue.

After careful consideration, the court finds that the "possibilities" noted by the Sixth Circuit which might legitimize the $30,000 loan were clearly demonstrated, on the record, to have been non-existent. The Court finds that the "loan", on all credible evidence, was clearly an integral part of the illegal management agreement, and was a device to provide plaintiffs with the *immediate benefit* of defendant's liquor license *without* the approval of Michigan's Liquor Control Commission.

In its earlier opinion, this court held: It is undisputed that Klukavy & Fitzgerald did assume full and complete control of the business immediately after signing the management agreement and prior to any approval from the Liquor Control Commission. Pursuant to this provision of the agreement, Klukavy & Fitzgerald received 100% of all gross sales of the business and made disbursements thereof in direct violation of the Michigan Administrative Code.

654 F.Supp. at 627.

The court noted further that the Michigan Liquor Control Commission had determined the illegality of the management agreement, after filing a complaint on April 4, 1983, and that plaintiffs admitted its illegality in an order signed in conjunction with a settlement of the matter by a Michigan administrative law judge.

The court then rejected plaintiffs' argument that despite such illegality, they should be permitted to sever the illegal provisions and proceed on the remaining terms, namely reimbursement of the $30,-000 allegedly loaned and payment to plaintiffs of the minimum wage for hours worked and five percent of the establishment's gross profits.

In rejecting plaintiffs' claim, the court stated:

In this case, the terms of the management agreement are not severable. The provision which essentially permitted Klukavy and Fitzgerald to assume total control of the operation and management of the business without the approval of the Liquor Control Commission is an essential part of the consideration for the whole agreement. It is so intertwined with the other provisions that without it, the remainder cannot stand as a distinct, valid and enforceable contract. The illegality of the objectionable clause permeates and vitiates the agreement in its entirety and renders the whole agreement void. See *Kukla v. Perry*, 361 Mich. 311, 105 N.W.2d 176 (1960).

654 F.Supp. at 627–628.

Now, having tried the matter, the following findings of fact may be added.

■ Plaintiffs first argue that Joseph B. Levanski, president and a 31% owner of Lafayette–Orleans, was in such "dire straits" that he "insisted" upon the terms of the management agreement and dictated those terms to plaintiffs' lawyers. However, the documents and the testimony of record conclusively demonstrate that this claim is totally incredible.

First, as a general proposition, the party who is "in dire straits" is *not* the party with leverage to "insist" upon his preferred terms in any transaction.

Second, the documentary evidence and all the credible testimony in this case follows that rule. In letters to Evanski and Lafayette–Orleans dated November 30, 1981 and January 2, 1982, Fitzgerald & Klukavy demanded a management agreement and the right to make up to $30,000 in *immediate* improvements to the establishment, as essential conditions for entering into the purchase agreement eventually signed on February 6, 1982.

The November 30, 1981 letter, signed by Fitzgerald, states in relevant part:

> While the liquor license is being transfered (sic) *we will require* our being granted a sublease allowing us to operate the facility including the right to make *immediate* lease hold improvements of 20 to 30 thousand dollars.
>
> \*　\*　\*　\*　\*　\*
>
> If we cannot negotiate satisfactory purchase as stated we leave open the following option. We will make agreed lease hold improvements in return for a three year operation lease with an option to purchase [at] a higher price at any time within the stated period. (emphasis added).

The plaintiffs' minimum demand of a three-year operation sublease or management contract is reiterated in the January 2, 1982 letter, which states in relevant part:

> In order to complete our transaction, a contract reflecting the following is to be signed by all parties.
>
> \*　\*　\*　\*　\*　\*
>
> 3. *Management contract for 3 years in the event complications arise* out of transfer of business to begin upon paying I.R.S. approximately $26,000 in back taxes. Contract to be written *allowing full contract of operations* and right to capital improvements including name change of business. This contract will show our only liabilitys (sic) to be the payment of rents according to present lease and utilitys (sic). (emphasis added).

Clearly, if defendant, through Evanski, were dictating the terms of the purchase and management agreements, plaintiffs would not be in a position to state "we will require" a minimum three-year sublease or management contract "including the right to make immediate leasehold improvements." Nor could plaintiffs have insisted that the management contract allow "full contract of operations and rights to capital improvements including name change of business."

In addition to the documentary evidence, all of the credible testimony suggest that it was *plaintiffs* who insisted on the minimum three-year management contract as a condition of purchase.

First, Evanski testified and Fitzgerald admitted that it was plaintiffs' attorney who actually drafted the November 30 and January 2 letters. Evanski testified that he accepted plaintiffs' terms, as drafted by their attorney, because plaintiffs told him of their prior successful *experience* in using a management agreement and "loans" to effect an immediate takeover of an establishment requiring a liquor license.

Evanski also testified that he had never proposed such terms and that the papers drafted by plaintiffs' attorney were not his grammar or spelling, which is certainly true when his undisputed writings are compared with the materials of disputed origin.

Moreover, it was Evanski's unrebutted testimony that Fitzgerald told him that a three-year management agreement "would look good to the Liquor Control Commission."

Evanski credibly testified that he was concerned that the plan as plaintiffs originally had proposed it permitted plaintiffs to operate indefinitely on his liquor license, and that he did have to insist upon language requiring them to proceed with an application to the Liquor Control Commission reasonably soon. Otherwise, he feared they would stall on making an application, which in fact they did do.

Evanski testified that plaintiffs' attorney attended every meeting in which the proposed purchase and management agreements were discussed, and that plaintiffs' attorney *actually drafted* the proposed agreements, with Evanski suggesting only the inclusion of provisions requiring the managers (plaintiffs) to maintain casualty insurance and requiring approval of the liquor license transfer by the Liquor Control Commission.

Later on, Evanski had a serious problem pushing plaintiffs to even *make* an application to the Commission. Evanski testified that plaintiffs' lawyer repeatedly claimed, on inquiry, that he would "walk the application through" the next day, but never did so. Evanski also testified that regardless

of plaintiffs' attorney's claims that the Commission's procedures could take *years*, it was his personal knowledge that a license could be obtained with the assistance of a broker in about 30 days, and that in no event should the process consume more than 60 to 90 days.

It is undisputed that plaintiffs did not even make their application to the Liquor Control Commission until almost eight months after the agreements were signed, during all of which period they operated the bar. They have yet to make any accounting whatsoever as to the bar's revenues or expenses, during that period.

██ In light of the documents and the credible testimony, it is clear to the court that the management agreement with its provision for "loans" was designed by plaintiffs themselves to permit plaintiffs to begin operating the bar without transfer of the liquor license, in violation of law.

As already noted, the November 30 and January 2 letters from plaintiffs to Evanski demanded either an operating sublease or a management contract *for a minimum* of three years. Although neither proposal even mentions any deadline for seeking or obtaining Liquor Control Commission approval of a license transfer, both letters clearly show an intent by plaintiffs to move full steam ahead in taking over and remaking the bar in the likeness of plaintiffs' other successful establishment, which was also called "The Perfect Blend", and was located in a nearby suburb.

The November 30 letter demanding "the right to make immediate lease hold improvements" of up to $30,000 described the improvements specifically as:

1. New lighting system
2. New sound system
3. New carpeting
4. Repair computor bar (sic)
5. Repair seating areas

Similarly, the January 2 letter provided that the management contract allow "full contract of operations and rights to capital improvements including name change of business."

Thus, it is overwhelmingly clear from the documentary evidence and the testimony that plaintiffs were seeking to obtain an "interest in or benefit from defendant's liquor license" *for up to three years* without actually obtaining a transfer of that license to their new, as-yet unformed, corporation T.R.F.J.

In fact, plaintiffs' corporation was not incorporated until January, 1983, *nearly a year* after the initial purchase agreement and the management agreement were signed on February 6, 1982. The plaintiffs' corporation, the purchaser, did not even exist at the time of the alleged advances under the February 1982 management agreement.

In this particular, it is also worth noting that the $30,000 allegedly lent under the management agreement was NOT to be credited against the purchase price, but rather to be "reimbursed" to plaintiffs as individuals "on sale of the business or termination of this [three-year management] Agreement by its terms." (emphasis added). See ¶ 6 of the management agreement.

In attempting to dispute the overwhelming evidence of their intent to use the management agreement to improperly benefit from defendant's liquor license, plaintiffs offer only their own self-contradictory and incredible testimony that they were at Evanski's mercy in bargaining these contracts because he was "desperate." Aside from the obvious fact that a "desperate" man cannot insist upon his preferred terms in a contract, Fitzgerald's testimony made it clear that the immediate implementation of the management agreement was at the very least as important to plaintiffs as it was to the defendant.

Fitzgerald testified that, because Lafayette–Orleans was deeply in debt for unpaid taxes, back rent, and other debts, "Evanski and the stockholders didn't want to do anymore" and that if the establishment closed, the lease would be lost. Both Fitzgerald and Evanski asserted that unless the business *continued* to operate, there would be no business to buy.

Under such circumstances, it is clear that time was of the essence to plaintiffs as much as it was to the defendant, i.e., unless the parties acted quickly, "there would be no business to buy."

Indeed, the money spent by plaintiffs after execution of the management agreement, if their undocumented testimony is believed, was *far in excess* of the $30,000 "loan" authorized by the agreement.

Fitzgerald testified at trial that plaintiff spent the following sums after implementation of the management agreement:

$34,000 — back taxes to the I.R.S.
$13,400 — back taxes to State of Michigan
$32,500 — improvements to the establishment
$ 7,100 — garnishment against account for back taxes
$ 5,200 — unpaid City of Detroit water bill
———————
$92,200

No information is available as to the income generated by the bar, during that same period of plaintiffs' control. If plaintiffs' testimony is credited, all of these sums were paid without the benefit of the transfer of the business to plaintiff's (as-yet-unformed) corporation, since such transfer was contingent on the (as-yet unobtained) approval of the liquor license transfer by the Liquor Control Commission.

Despite expending all these sums, plaintiffs only sue here for the $30,000, because that was the only alleged advance they were entitled to make under the management agreement. Clearly, they are seeking to enforce the management contract with the *new* claim that the $30,000 loan was part of the purchase of the establishment.

Yet, the inevitable question remains: if plaintiffs made more than $90,000 in "advances" to be credited against the purchase price, pursuant to the terms of the purchase agreement, then why is a $30,000 "advance or loan" specifically set forth in the separate management agreement? The only explanation consistent with the documents and testimony of record is that that sum was necessary for plaintiffs to *immediately* take over and *immediately* benefit from defendant's ongoing business, including defendant's liquor license. Plaintiffs needed the present ability to make payments owed by Lafayette–Orleans, in order to preserve the establishment as an operating entity, for plaintiffs' own benefit.

■ Finally, even if the management agreement were *not* illegal, plaintiff have glaringly failed to demonstrate that all advances were not repaid to them already by the earnings of the bar, which was totally under their control. In fact, plaintiffs actually have failed to prove that they even made the advances in the first place. Their testimony is inconsistent and incredible in every respect, and unsupported by any documentation whatsoever.

In two years of operation, Fitzgerald acknowledged gross sales of $496,000, and specifically admitted to $225,000 in gross sales in 1982. Despite this, Fitzgerald claimed at trial that he never realized one dollar of income from the establishment, and plaintiffs seek to claim all their expenses—identified or otherwise—from defendant as "advances," with no documentation whatsoever to support their representations. Evanski, however, testified that Lafayette–Orleans never received any funds from plaintiffs or their partnership.

Given the undisputed facts that, upon signing the management agreement, plaintiffs obtained complete control over 100% of the gross sales of the establishment; that such receipts amounted to $496,000 over a two-year period; and that plaintiffs are entirely without documentation to support their claim that all receipts were expended to meet Lafayette–Orleans' expenses, the court can only conclude that, even if the agreement were not an illegal and unenforceable one, plaintiffs have failed to meet their burden of proof on the claim for funds advanced. They have not provided any documentation whatsoever, to defendant or this court, with regard to the alleged "advances" made on defendant's behalf. Fitzgerald, in his sworn statement to United National Insurance Company, indicated that during the period covered by the 1983 U.S. partnership income tax re-

turn filed in the name of Detroit Perfect Blend, "Lafayette Orleans did not have any income or deductions or nothing during that particular time." See defendant's Exhibit 10, page 53.

Nevertheless, the evidence of record demonstrates that their partnership did in fact earn income during plaintiffs' tenure at the bar.

Plaintiffs themselves, after the fire, claimed to the insurance company's adjuster that they had lost *profits* as a result of the destruction of the establishment. According to Fitzgerald's sworn statement to the insurance carrier, the 1983 U.S. partnership income tax return shows a profit of $35,000. In that statement, plaintiff further explained that the partnership Financial Statement only showed a profit of $13,500, because a large attorney's fee had been included in the tax return as income, but deducted therefrom in the Financial Statement.

Moreover, although Fitzgerald testified at trial that any income reported by the partners was "only paper money", all the evidence suggests that the establishment more than met its expenses. Incredibly, Fitzgerald stated on the witness stand that he "can't recall" filing a proof of loss with the insurance carrier claiming $35,000 in lost profits.

Thus, plaintiffs have completely failed to meet their burden of proof to show that they really made advances, and if so, that such advances were not fully repaid to them by the earnings of the bar.

██ Moreover, Evanski testified that Lafayette–Orleans incurred certain expenses *after the fire* that were improperly transferred to it by plaintiffs, and which more than offset the alleged $30,000 loan or advance under the management agreement. Those expenses include $8,000 in unpaid rent, $7,000 in unpaid utility bills, $20,000 to settle a lawsuit by two of plaintiff's employees at the establishment, and because of the delay in transferring the business pursuant to the purchase agreement, $20,000 in extra interest in the period between 90 days after signing the purchase agreement and the date of the fire.

Although defendant did not document these claimed expenses, the testimony was unrebutted by plaintiffs. Thus, even were the court to find that plaintiffs had met their burden of proving their $30,000 loan was in fact made, and was *not* reimbursed through the earnings of the bar, the court would have to find that the amount was more than offset by defendant's damages as a result of plaintiffs' failure to meet their obligations under the management agreement, after the fire destroying the premises.

In summary on the basis of the entire record, this court finds that the alleged $30,000 advance or loan is claimed pursuant to the management agreement, and was not "an independent transaction" but rather part of an unlawful contract designed to provide plaintiffs with "an interest in and benefit from defendant's liquor license," *for up to three years* without an approved transfer of the license from the Liquor Control Commission. The court also finds plaintiffs' testimony at trial to have been inconsistent with their own prior sworn statements, contrary to the documentary evidence of record, and otherwise incredible.

In addition, even if the provision of the management agreement providing for "reimburse[ment]" of a $30,000 loan to plaintiffs individually was severable and independent of the remaining terms of the illegal management agreement, plaintiffs have failed to meet their burden of proof in a claim of account, to prove that the $30,000 advance was actually made, and if so, that they have not been already fully reimbursed through the earnings of the establishment.

This court previously issued its opinion in this case at 654 F.Supp. 622, and set forth its conclusions of law in that opinion. The court recognized that:

> [W]here a claim consists of several distinct items, some good and others bad, or where the transaction is of such a nature that the good part of the consideration may be separated from the bad, the com-

mon law discriminates between them, by permitting recovery for the former while it repudiates the latter. [citation omitted.]

Id. at 627, quoting *Smilansky v. Mandel Bros.*, 254 Mich. 575, 582, 236 N.W. 866 (1931). The court found, however, that in this case the terms of the management agreement were *not* severable, and that the provision allowing Klukavy & Fitzgerald to assume total control and management of the business without approval of the Liquor Control Commission was illegal, and that the illegality "permeates and vitiates the agreement in its entirety, and renders the whole agreement void."

The Court of Appeals also recognized the controlling law, but remanded based on its finding that there was inadequate factual development as to whether the alleged $30,000 loan was independent of, and severable from, the illegal provisions of the management agreement. In light of the findings of fact set forth above, the court holds that the provision for a $30,000 loan or advance was so intertwined with and integral to plaintiffs' attempt to illegally benefit from defendant's liquor license—and so utterly lacking in independent consideration—as to be vitiated by the illegality of the management agreement, and with it, rendered void. See *Kukla v. Perry,* 361 Mich. 311, 105 N.W.2d 176 (1960).

Therefore, IT IS ORDERED that judgment is granted for defendant on plaintiff's claim of account, and plaintiffs' complaint is dismissed in its entirety with prejudice.