684 N.W.2d 342 (2004)
471 Mich. 851
David SANCHEZ, Plaintiff-Appellant, Cross-Appellee,
v.
EAGLE ALLOY, INC., and Second Injury Fund, Defendants-Appellees, Cross-Appellants.
Alejandro Vazquez, Plaintiff-Appellant, Cross-Appellee,
v.
Eagle Alloy, Inc., Defendant-Appellee, Cross-Appellant.
Docket Nos. 123114, 123115. COA Nos. 238003, 239592.
Supreme Court of Michigan.
July 23, 2004.
On order of the Court, leave to appeal having been granted and the Court having considered the briefs and oral arguments of the parties, the order of which granted leave to appeal is VACATED and leave to appeal and leave to appeal as cross-appellant November 7, 2003 are DENIED because the Court is no longer persuaded the questions presented should be reviewed by this Court.
WEAVER, J. (concurring).
I concur in the order dismissing the case; I believe the Court of Appeals opinion is correct and would adopt its opinion.
By dismissing this case, we leave the published Court of Appeals opinion as binding precedent, which gives the bench, the bar, and interested parties guidance on these issues.
MARILYN J. KELLY, J. (dissenting).
After full briefing and oral argument, a majority of the Court has decided that leave was improvidently granted. I respectfully disagree. I would not avoid the issues presented. They are jurisprudentially significant. The parties, the people of Michigan, and those who come into the state to work have a pressing interest in having these issues resolved by the state's highest court.
MARKMAN, J. (dissenting).
I disagree with the majority that leave has been improvidently granted in this case and, therefore, I respectfully dissent. Instead, I believe that issues pertaining to the legal consequences of illegal alien status in Michigan  in this case, the eligibility of such persons for worker's compensation benefits  are important ones *343 and deserve full consideration by this Court.[1] These issues are important not only for their impact upon illegal aliens, but equally for their impact upon the rule of law and the meaning of citizenship. I would have embarked in this case upon the process of addressing these issues.
There are two principal legal issues involved here, in my judgment. The first is whether there can be a valid contract of hire under the circumstances of illegality in this case. The second is whether the burden is upon the Legislature to affirmatively include illegal aliens within the coverage of a statute, if this is their intention, or to affirmatively exclude illegal aliens from coverage, if this is their intention. By failing to address these issues, this Court leaves the legislative and executive branches without guidance concerning whether coverage under countless state statutes is identical between illegal aliens and persons who are citizens or otherwise lawfully within the United States.
There is no dispute that illegality permeates the relationship between the parties in this case. Plaintiffs obtained forged Social Security and alien identification cards and lied on their employment applications with defendant with regard to their immigration and Social Security status.
The Immigration Reform and Control Act [IRCA], 8 U.S.C. 1101 et seq., clearly shows Congress's intent to proscribe the employment of illegal aliens, such as plaintiffs. Pursuant to 8 U.S.C. 1324a(a), which is captioned "Making employment of unauthorized aliens unlawful," it is unlawful to knowingly hire illegal aliens for employment in the United States. In addition, 8 U.S.C. 1324a(b)(1) requires a prospective employee to submit to an examination of documentation, and 8 U.S.C. 1324a(b)(2) requires such an employee to attest, under penalty of perjury, that he is not an illegal alien. 18 U.S.C. 1001 and 42 U.S.C. 408(a)(7) punish as crimes the fraudulent procurement or use of social security numbers and similar documentation. Moreover, 8 U.S.C. 1324c(a) specifically prohibits the use of fraudulent documents to seek employment and 8 U.S.C. 1325(a) provides criminal punishment for one who has entered the United States by false or misleading representations or by the concealment of material facts.
The clear import of these federal laws is that an illegal alien is not lawfully employable in the United States.[2] Further, the clear import of these laws  which constitute the "supreme Law of the Land" under U.S. Const., art. VI  is that an illegal alien is not lawfully employable in Michigan.[3] *344 Indeed, at all times while in this country, the illegal alien is in violation of the law, and subject to immediate arrest and incarceration or deportation. As the United States Supreme Court observed in Hoffman Plastic Compounds, Inc. v. Nat'l Labor Relations Bd., 535 U.S. 137, 148, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002),
Under the IRCA regime, it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies. Either the undocumented alien tenders fraudulent identification, which subverts the cornerstone of IRCA's enforcement mechanism, or the employer knowingly hires the undocumented alien in direct contradiction of its IRCA obligations.
What are the implications of illegal behavior in other contractual circumstances under Michigan law? It is well-established that a promise or agreement requiring the performance of a criminal or tortious act is illegal, unenforceable, and void. See 5 Williston on Contracts, 4th ed., § 12:1, p. 570. As this Court stated in Cashin v. Pliter, 168 Mich. 386, 390, 134 N.W. 482 (1912), quoting In re Reidy's Estate, 164 Mich. 167, 173, 129 N.W. 196 (1910): "`It is a well-settled principle of law that all contracts which are founded on an act prohibited by a statute under a penalty are void, although not expressly declared to be so.'" See also Kukla v. Perry, 361 Mich. 311, 324, 105 N.W.2d 176 (1960) (noting that a contract that is violative of a statute is void even if the applicable statute does not so provide); Stokes v. Millen Roofing Co., 466 Mich. 660, 672, 649 N.W.2d 371 (2002), quoting Bilt-More Homes, Inc. v. French, 373 Mich. 693, 699, 130 N.W.2d 907(1964) (contracts by a residential builder not duly licensed as required by statute are "`not only voidable but void'").
Similarly, contracts that offend public policy may be declared illegal and void. See Williston, supra, pp. 546, 559; see also Cook v. Wolverine Stockyards Co., 344 Mich. 207, 209, 73 N.W.2d 902 (1955). "`If any part of a consideration is illegal, the whole consideration is void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or promise....'" Kukla, supra at 325, 105 N.W.2d 176, quoting McNamara v. Gargett, 68 Mich. 454, 462, 36 N.W. 218 (1888). Indeed, as this Court noted in Sands Appliance Services, Inc. v. Wilson, 463 Mich. 231, 239, 615 N.W.2d 241 (2000), it is the duty of the courts to "refuse to enforce a contract that is contrary to public policy."
See also, Terrien v. Zwit, 467 Mich. 56, 66-67, 648 N.W.2d 602 (2002), in which this Court addressed the judiciary's obligation to enforce "public policy" as a means of nullifying a contractual relation. "In identifying the boundaries of public policy ... the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law." In Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 89 L.Ed. 744 (1945), the United States Supreme Court stated similarly, "[T]here must be found definite indications in the law of the sovereign to justify the invalidation of a contract as contrary to that policy."
*345 Finally, the "wrongful conduct rule" of Orzel v. Scott Drug Co., 449 Mich. 550, 537 N.W.2d 208 (1995), provides that when "a plaintiff's action is based in whole or in part, on his own illegal conduct," his claim is generally barred. Id. at 558, 537 N.W.2d 208. This rule rests on the premise that courts should not, directly or indirectly, encourage or tolerate illegal activities.
The rationale that Michigan courts have used to support the wrongful-conduct rule are rooted in the public policy that courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct. If courts chose to regularly give their aid under such circumstances, several unacceptable consequences would result. First, by making relief potentially available for wrongdoers, courts in effect would condone and encourage illegal conduct. Second, some wrongdoers would be able to receive a profit or compensation as a result of their illegal acts. Third, and related to the two previously mentioned results, the public would view the legal system as a mockery of justice. Fourth, and finally, wrongdoers would be able to shift much of the responsibility for their illegal acts to other parties. [Id. at 559-560, 537 N.W.2d 208 (citations omitted).]
More specifically, as this Court observed in Crane v. Reeder, 21 Mich. 24, 67-68 (1870),
The laws of congress manifest a disposition to open the door as wide as possible to induce aliens to become citizens. But they show as plain an intent not to give any special privileges to aliens who do not comply with the statutes.... The disability of alienage ... always rested on the broader principle that states are organized for the benefit of their own people, and that those who are not within the allegiance can have no claim beyond what the law sees fit to give them.
In addition to addressing the consequences of illegal behavior for contracts of hire in Michigan, this Court should address whether it is to be presumed that the countless references in Michigan statutes (as well as in the Michigan Constitution, art. 10, § 6) to "persons" or "aliens" necessarily encompass illegal aliens. Is the burden upon the Legislature to affirmatively include illegal aliens within these terms and within these statutes, or is the burden upon the Legislature to affirmatively exclude illegal aliens from within these terms and from within these statutes? Is the presumption that Michigan law is neutral as between illegal aliens and persons who are citizens or otherwise lawfully within the United States, or is the presumption that illegal aliens do not constitute a part of the civil community in the same way as do citizens and legal aliens? The overarching issue here pertains to the cognizance that the legal system will take of the uniquely unlawful behavior of illegal aliens, an unlawful behavior that is ongoing and omnipresent.
While the decision below of the Court of Appeals may reflect to some a reasonable compromise, allowing illegal aliens to receive partial, but not full, workers compensation benefits, each of the underpinnings of this compromise is open to legal question. Moreover, in my judgment, a serious policy on the standing of illegal aliens within the legal system cannot rest ultimately, as it does in the Courts decision, upon how successful an illegal alien has been in avoiding detection of his conduct.
The issues in this case are substantial ones and of considerable importance to our state. They affect large numbers of Michigan statutes, they implicate legal principles of the highest order, and they are likely to become increasingly significant in *346 the years ahead. These issues are exactly the sort concerning which the people of Michigan and their Legislature are entitled to guidance from the highest court of their State.[4]
NOTES
[1] Commissioner Witte of the Worker's Compensation Appellate Commission observed at the outset of her opinion below: "In our collective memory, no case has engendered more passionate debate at the [WCAC] than the following matter ... whether an injured illegal alien is entitled to worker's compensation benefits."
[2] The purposes of the federal laws governing employment of aliens include removing financial incentives for illegal immigration and the promotion of jobs for legal workers by reducing the jobs available to illegal workers. See anno: validity, construction, and application of § 274A of immigration and nationality act (8 U.S.C.S. § 1324A), involving unlawful employment of aliens, 130 A.L.R.Fed. 381, § 2[a], 396. As noted recently by the United States Supreme Court in Hoffman Plastic Compounds, Inc. v. Nat'l Labor Relations Bd., 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002), quoting Immigration & Naturalization Service v. National Center for Immigrants' Rights, Inc., 502 U.S. 183, 194 n. 8, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991), the IRCA "`forcefully' made combating the employment of illegal aliens central to `the policy of immigration law.'"
[3] Moreover, with regard to what specifically is at issue in the instant case  worker's compensation benefits  MCL 418.361(1) provides that an employer shall not be liable for economic benefits "for such periods of time that the employee is unable to obtain or perform work because of imprisonment or commission of a crime." Sweatt v. Dep't of Corrections, 468 Mich. 172, 661 N.W.2d 201 (2003). See also MCL 418.301(4); Sington v. Chrysler Corp., 467 Mich. 144, 648 N.W.2d 624 (2002).
[4] See, e.g., the decisions of the Supreme Courts in Virginia, Granados v. Windson Devt. Corp., 257 Va. 103, 509 S.E.2d 290 (1999), and Connecticut, Dowling v. Slotnik, 244 Conn. 781, 712 A.2d 396 (1998), which reach very different results in addressing these issues. These cases also make clear that broader legal issues concerning the effect of illegal alien status cannot be decided free from consideration of the specific facts of particular cases. IRCA, for example, makes clear that both the illegal alien and the employer of the illegal alien possess legal obligations under the act. Possibly relevant to this case is that defendant employed significant numbers of illegal aliens and received economic value from plaintiffs before their injuries.