Kimberly **IDALSKI**, Personal Representative of the Estate of Lori Cothran, Plaintiff,

v.

**CROUSE CARTAGE COMPANY** and **Transfinancial Holdings, Inc.,** Defendants,

and

Jeanne Cothran, Legal Guardian of Kaleb Cothran, an infant child, and Kaleb Cothran, an infant child, Plaintiffs,

v.

**Crouse Cartage Company** and **Transfinancial Holdings, Inc.,** Defendants.

Nos. 99–10265–BC, 99–10330–BC.

United States District Court, E.D. Michigan, Northern Division.

Sept. 26, 2002.

Robert S. Harrison, Harrison Assoc., Bloomfield Hills, MI, Christopher J. Keane, Keane & Keane, Dearborn, MI, George A. Googasian, Googasian Law Firm, Bloomfield Hill, MI, for Plaintiffs.

George W. Steel, Harvey, Kruse, Flint, MI, Gary R. Campbell, Lippert & Humphreys, Saginaw, MI, for Defendants.

Kenneth W. Kable, Braun, Kendrick, Saginaw, MI, Donald J. McLennan, Rogers City, MI, for Claimants.

Kenneth W. Kable, Braun, Kendrick, Saginaw, MI, Ernest R. Bazzana, Plunkett & Cooney, Bloomfield Hills, MI, Steve R. DuBois, Dubois, Westerman, Gaylord, MI, Donald J. McLennan, Rogers City, MI, Joel D. Wurster, Pending App., Stroup, Erhart, Petoskey, MI, Thomas A. DeMeester, Day & Sawdey, Grand Rapids, MI, Cynthia C. Charles, Michigan Attorney Grievance Commission, Detroit, MI, for Movants.

## OPINION AND ORDER DETERMINING OBLIGATION TO PAY ATTORNEY REFERRAL FEE AND ADJUDICATING MOTIONS AND CLAIMS FOR DISTRIBUTION OF REFERRAL FEE

LAWSON, District Judge.

This matter is presently before the Court on the motions filed by several contestants to a portion of an attorney fee which the Court approved as part of a settlement in these consolidated actions. On August 15, 2000, this Court's predecessor, the Honorable Victoria A. Roberts, entered an order approving payment to the respective plaintiffs in the gross amount of $5 million. The Court also approved an attorney fee payable to Attorneys Robert Harrison and Christopher Keane in the amount of $1,646,442.22.

Thomas R. Lewis, a disbarred attorney, has claimed entitlement to a portion of the attorney fee pursuant to a referral agreement. Judge Roberts ruled that Mr. Lewis was not entitled to any portion of the fee because of certain acts of misconduct and his loss of status as an attorney in good standing and member of the Bar. However, because Lewis was not notified or heard on the matter, this Court entered an order on January 23, 2001 vacating that portion of Judge Roberts' order concerning entitlement to a referral fee and set the matter for a hearing.

Lewis was convicted of embezzlement in the Michigan criminal courts, and he has been accused of misappropriating client funds in amounts exceeding $700,000, which remain unpaid. Consequently, others in addition to Lewis have made claim to the referral fee, including the Michigan State Bar Grievance Administrator and the Presque Isle County Prosecuting Attorney on behalf of Lewis' alleged victims. All of the claimants agree, however, that their claims of entitlement are derivative

of Lewis' right *vel non* to a portion of the fee.

The parties have filed affidavits and documentary exhibits, and the deposition of Thomas Lewis was taken and videotaped, and the depositions of Kimberly Idalski, Jeanne Cothran and Donald Cothran have been submitted. A hearing was conducted and the evidentiary record was closed on September 23, 2002. The Court previously ordered that the parties and claimants file briefs addressing the following questions:

(a) Whether, under the applicable law and disciplinary rules, a client is required to consent to the payment of a referral fee at the time of payment to the referring attorney before payment may be made;

(b) Whether a disbarred or suspended attorney may recover a referral fee on the basis of *quantum meruit* under the Michigan Rules of Professional Conduct, Mich. Ct. R. 9.119(F), or other applicable provisions of law when the misconducted is directed at the client whose case generates the fee; and

(c) Whether, in determining the value of the referring attorney's services on the basis of *quantum meruit*, it is appropriate for the Court to consider the services provided by the referring attorney after the misconduct was committed against the client whose case generated the fee, but prior to the suspension or disbarment of the referring attorney.

The issues have been thoroughly briefed by the contestants and hearings have been conducted. The matter is now ready for decision.

Based upon the facts as determined by the Court as set forth below, the Court concludes that the rules regulating referral fee agreements require client consent only at the time the agreement is made, and not also immediately prior to payment. However, a client's agreement to a referral fee, like any contract, may be vitiated by fraud which induces the consent; the plaintiffs were fraudulently induced to consent to the referral agreement, and thus the referral agreement is voidable. The Court also concludes that Lewis' misconduct toward his former clients was not severable from other phases of his representation of the Lori Cothran Estate and Kaleb Cothran, and therefore he has forfeited his right to a fee under the referral fee agreement and *quantum meruit*. The Court will find, therefore, that Lewis' request and the request of the other claimants in this case for a portion of the attorney fee will be denied.

I.

The accident in this case occurred on May 7, 1997 in Presque Isle County when Lori Cothran's vehicle was struck from the rear and crushed by a logging truck. Lori was killed and her infant son, Kaleb Cothran, was seriously injured. Lewis, whose own daughter was a close friend of Lori Cothran, learned about the accident later that day and went to a hospital in Alpena, Michigan to meet Lori's parents, Jeanne and Donald Cothran, and Lori's sister, Kimberly Idalski, at their request. Kaleb was hospitalized there in an intensive care unit.

Lewis testified that Jeanne Cothran's primary concern was the custody of Kaleb, whose father was not married to Lori and had not acknowledged paternity, but nonetheless posed a threat, real or imagined, to Jeanne Cothran's care of the child. The Cothrans also asked Lewis to identify Lori's body at a local funeral home.

According to the testimony, Lewis determined that the most efficient way to address Jeanne Cothran's concerns was to petition the local probate court to have Jeanne Cothran appointed as Kaleb's con-

servator and temporary guardian, which he did shortly after the funeral. He also prepared papers to commence adoption proceedings, but that matter was not pursued. Lewis opened an estate for Lori Cothran, naming Kimberly Idalski as personal representative, and obtained an order appointing Jeanne Cothran as Kaleb's conservator and temporary guardian. Lewis states that he had Jeanne Cothran and Kimberly Idalski sign fee agreements for these services. Less than a week after the accident, Lewis entered into separate agreements with Kimberly Idalski and Jeanne Cothran, in their anticipated roles as personal representative and conservator of the respective estates, to represent Lori Cothran's estate and Kaleb Cothran

> in connection with any and all claims of damages or compensation which may arise out of an accident occurring on May 7, 1997, on U.S. 23 approximately one-half mile West of Miller Road, County of Presque Isle, State of Michigan, in which [LORI D. COTHRAN and KALEB H. COTHRAN] w[ere] involved in an auto-related accident and which has been summarized in an incident report from the Presque Isle County Sheriff Department being its Complaint No. 2153–97.

Contingent Fee Agreements, May 13, 1997. The agreements called for an attorney fee of one-third of the net proceeds recovered by settlement or judgment.

Around the time of the funeral, the Cothrans received several donations of cash and checks from members of the community. They kept a record indicating receipt of $1,457 in cash and $3,873 in checks. This property was turned over to Lewis for safe keeping. Lewis testified that he put the cash, which he estimated to be between $700 and $900, in his safe. Lewis denies that he stole these funds, but he acknowledges that he never gave them back to the Cothrans.

According to Lewis, he set about the task of prosecuting the claims for damages by hiring an investigative agency; contacting (but not hiring) experts in the fields of accident reconstruction, accounting and medicine; and corresponding with claims representatives of the trucking company's insurer and Lori Cothran's insurer. However, Lewis did not hire any experts to assist in proving liability or damages; he did not engage any medical experts to evaluate Kaleb's potential traumatic brain injury; and he did not file a lawsuit. He did, however, obtain approximately $21,000 in first-party insurance benefits and approximately $15,000 in life insurance proceeds, which he deposited in his various office accounts. Lewis then converted these funds to his own use. He later returned $5,000 to the Cothrans pursuant to their request and signed a promissory note for the balance, but it is undisputed that the balance of those funds remain unpaid.

In July 1998, Lewis sent his first settlement demand to the defendant's insurance adjuster. In his letter, Lewis acknowledged that his experts (whom he had not engaged) had not completed their reports, but he nonetheless evaluated Lori Cothran's wrongful death clam at $2 million and Kaleb Cothran's injury claim at $1.5 million. He demanded a total of $3.5 million and requested that the adjuster set up a telephone conference with him.

The correspondence and conversations with the trucking company's insurance adjuster generated a settlement offer sent to Lewis on October 9, 1998. The offer included a proposal for periodic payments (i.e., a so-called "structured settlement"), which Lewis had evaluated by an accountant (whose bill he did not pay). Lewis estimated the present value of the settlement offer, using a seven percent discount factor, at "under $500,000." Letter of

Lewis to Liberty Mutual Group dated March 3, 1999 at 1. Lewis countered with a demand on behalf of Lori Cothran's estate and Kaleb Cothran in the aggregate amount of $2.5 million. At his deposition, Lewis was not able to offer a reason for the $1 million reduction in value of the cases that apparently occurred between July 1998 and March 1999. There is no record of a response to this demand.

Meanwhile, in December 1998, Lewis received the first of several requests for investigation from the Michigan Attorney Grievance Commission alleging misconduct in connection with Lewis' handling of client funds. A second grievance was filed against Lewis by another client in early 1999. In February 1999, Lewis was interviewed by a Michigan State Police detective investigating embezzlement charges on the complaints of other clients. It was also around this time that Lewis began to realize, according to him, that prosecuting the Cothran litigation in a federal forum may have been beyond his level of competence. Lewis began consulting with an attorney in Northern Michigan regarding his cases and personal troubles, and eventually he was referred to a lawyer in the Detroit area to represent him on his Bar grievances. Then on April 5, 1999, Lewis was formally charged with felony embezzlement in connection with the theft of client funds unrelated to this case.

According to Jeanne Cothran, Lewis contacted Donald Cothran sometime after May 1998 and sought permission to invest the money they had received from the insurance companies. He told Donald that he would deposit the funds in a "Schwab account" in Petoskey, Michigan. The Cothrans periodically questioned Lewis about the funds, but his responses were "evasive." Plaintiffs' Ex. 16; dep. of Jeanne Cothran, 5/21/01 at 23–24. After Lewis was charged with embezzlement, the Cothrans' concern intensified and they

demanded written proof that their money was safe. Lewis responded by driving with Donald Cothran to a parcel of real estate in rural Presque Isle County which Lewis and his wife were buying on a land contract, told Donald Cothran the funds were "secure," and stated that the money was invested in the property. Dep. of Thomas R. Lewis, 2/16/01 at 74. None of this was true, of course, as Lewis had spent the money on his day-to-day business expenses without the Cothran's permission.

On May 9, 1999, Lewis signed the promissory note referenced above, payable to Jeanne Cothran and Kimberly Idalski in their representative capacities in the amount of $36,202.75 at eight percent interest. The terms of the note required repayment when he refinanced his interest in certain real estate, the accident claims were settled, or the passage of sixty days, whichever occurred first. The amount represents the funds Lewis stole from the Cothrans (not including the money from the community contributions left with him for safekeeping) and remains unpaid.

Around this time Lewis met with Robert Harrison, one of the Cothrans' current attorneys, to discuss referring the injury and wrongful death cases to him. Lewis eventually reached an agreement with Harrison and Christopher Keane, which is memorialized in a letter dated May 6, 1999 signed by Lewis and the two attorneys. The agreement requires Lewis to do no further work on the case, provides for reimbursement of Lewis' expenses, and establishes a referral fee for Lewis in an amount ranging from two-thirds to one-third of the total contingency fee, depending on the settlement amount and whether a lawsuit was filed to effectuate recovery.

On May 8, 1999, Harrison entered into a contingent fee agreement with Jeanne Cothran as guardian and conservator of

Kaleb, and Keane entered into a contingent fee agreement with Kimberly Idalski as personal representative of Lori Cothran's estate. The Harrison agreement authorizes payment of a referral fee to Lewis. It is undisputed that the Cothrans were informed of the referral arrangement and agreed to it at the time. All parties agree that the contingency obligation of the Cothrans would not exceed one-third of the net recovery regardless of whether a referral fee were paid.

The Cothrans' already shaken faith in Thomas Lewis was finally destroyed in July 1999. It was during this month that Jeanne Cothran's annual account as conservator was due in the probate court. She prepared a hand-written account of fiduciary describing the receipt of funds, a summary of expenses and a list of assets including Lewis' promissory note. Jeanne Cothran gave the writing to Lewis, who would type it in proper format and file it in court. When Jeanne Cothran received a copy of the filed account, she became alarmed because Lewis falsely represented that the money was in a savings account and omitted any reference to the promissory note. Lewis later explained his rationale for filing a fraudulent account as follows:

> The Cothrans had indicated to me that they were concerned that that money came back. They were disappointed about that. The primary concern of all of us was to take care of the personal injury litigation as best we could. They were satisfied that I was—my impression was they were satisfied that I was honest with them. I was already—had already been charged with a felony in a case unrelated to this, and it was well-known and well-publicized. And Jeanne Cothran didn't know, and I didn't know, to tell you—the fact is I didn't know how we were going to account for the 33 or whatever thousands of dollars it was, I'm assuming it's that number, that was

interest—or was principal and interest as of that date, the date of that accounting, to the Court. And after she had submitted papers, including those that you showed me, I think it was Exhibit S, I was trying to decide what—how to represent it to the Court in terms of the money that was owed. I selected the language on number 3, without Jeanne knowing it, and filed it that way. And that's how it occurred, because I wasn't sure whether I was going to report the promissory note or whether in the current climate it was better to just get the account filed and try to get it resolved before the next account was filed.

Dep. of Thomas R. Lewis, 3/16/01 at 192–93.

Jeanne Cothran later went to the probate court, changed the court papers to reflect the true facts, and filed a copy of the promissory note. She and her husband then went to the Michigan State Police to report the incident. On July 30, 1999, the Cothrans sent Lewis written instructions to "immediately and forever cease to represent yourself as [our] attorney or agent" in their personal matters as well as the estates. Letter to Thomas R. Lewis dated July 30, 1999, at 1. On that same day, Harrison and Keane signed a letter to the Cothrans (acknowledged by Lewis two days later) reassuring them that Harrison and Keane would not pay a referral fee to Lewis in the wrongful death and injury cases until all the money Lewis owed them was repaid.

On October 29, 1999, Thomas R. Lewis was convicted of two counts of embezzlement over $100 upon his plea of *nolo contendre* in the Presque Isle County Circuit Court. His license to practice law was automatically suspended, and on September 12, 2000, he was disbarred. Lewis testified that the disbarment was later reversed and changed to a suspension and

further consideration ordered, although no written evidence of this action has been presented to this Court.

The Cothrans have now taken the position that Lewis should not be paid any referral fee. In a statement dated July 1, 2000, Jeanne and Donald Cothran and Kimberly Idalski declare:

> Without the knowledge of the Conservator and Guardian of Kaleb Cothran and the permission of the Personal Representative of the estate of Lori D. Cothran, Attorney Lewis stole the money from both estates and used it for his personal use. If we had known he had not invested the funds, as he led us to believe, we would have fired him as our attorney immediately. When we found out that he had been stealing the monies we fired him and we feel very betrayed that he stole money from us and from a minor, Kaleb Cothran. Therefore, we are requesting that Thomas Lewis, not be paid fees from any settlement monies that we may receive from our cases.

Plaintiffs' Ex. 21; *see also* dep. of Jeanne Cothran, 5/21/01 at 13–14; dep. of Kimberly Idalski, 5/21/01 at 11–12.

On August 15, 2000, Judge Roberts approved attorney fees from settlement proceeds payable to Harrison and Keane in amounts totaling $1,646,442.22. Harrison and Keane have followed the dictates of their clients and refused to pay a referral fee to Lewis. In the August 15, 2000 order, Judge Roberts held that Lewis was not entitled to receive a portion of the fee, nor was he entitled to *quantum meruit* recovery. Order Determining Existence of Attorney's Lien, at 2.

Thereafter, Presque Isle County, Michigan Probate Judge Mulhauser entered an order enjoining transfer of the payment to the judgment debtor and others and directed deposit of the referral fee into the state court on September 1, 2000. On September 5, 2000, the plaintiffs filed an emergency motion to enjoin state court action regarding attorney fees in these cases. Judge Roberts consulted with Judge Mulhauser, resulting in Judge Mulhauser vacating his previous order. Judge Roberts then issued an order requiring the disputed funds to be deposited with the Clerk of this Court and ordered any claimant to file a motion and brief showing cause why the August 15, 2000 order should not be given full effect.

As noted above, Lewis and other claimants then moved to set aside Judge Roberts' order determining that no referral fee ought to be paid, and this Court determined that Attorney Lewis, and through him all of the other claimants to a portion of the fee, had a right to be heard on the matter. Consequently, the portion of Judge Roberts' order of August 15, 2000 adjudicating the merits of the entitlement by Lewis to a referral fee was vacated so the matter could be reconsidered by this Court after the appropriate parties had an opportunity to be heard. That has now occurred.

II.

The courts of the United States are courts of limited and enumerated powers. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). The United States District Courts can decide only those matters authorized by the United States Constitution or by statute. *Ibid.* The original lawsuit in this case between the plaintiffs and Crouse Cartage Company involved a dispute between citizens of different states. Consequently, this Court had jurisdiction to adjudicate the matter pursuant to 28 U.S.C. § 1331(b).

The citizenship of the contestants to the disputed portion of the attorney fees is not diverse. However, district courts in this circuit may exercise jurisdiction over

fee disputes related to the main action. *Kalyawongsa v. Moffett*, 105 F.3d 283, 287 (6th Cir.1997). Jurisdiction persists even though diversity of citizenship does not exist. *Id.* at 287–88 (citing *Novinger v. E.I. DuPont de Nemours & Co.*, 809 F.2d 212 (3d Cir.1987)). The power to adjudicate such disputes is based upon the Court's supplemental jurisdiction to enforce settlement agreements over which it retains jurisdiction. The *Kokkonen* Court held that a "judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them a part of [the] order" approving the settlement. 511 U.S. at 381, 114 S.Ct. 1673. If the Court does not "retain jurisdiction," "enforcement of the settlement agreement is for state courts, unless there is some independent basis for federal jurisdiction." *Id.* at 382, 114 S.Ct. 1673.

In this case, however, Judge Roberts specifically stated in her order that "[t]he Court will retain jurisdiction in the event Mr. Lewis raises an issue concerning the payment of an attorney fee to him." Order Determining the Existence of Attorney's Lien, at 2. Since jurisdiction was specifically reserved to resolve this dispute, this Court concludes that it has the power and authority to proceed, at least insofar as deciding whether payment of the portion of the attorney fee to Lewis ought to be required.

### III.

### A.

In his motion before the Court seeking a portion of the approved attorney fee, Lewis looks first to the referral fee agreement which he and Harrison signed on May 6, 1999, to which the clients consented. The promise to pay a referral fee is one which the law will enforce; in other words, it is a contract, which has as its elemental requirements an offer, acceptance and consideration. *See Kalyawong-*

*sa*, 105 F.3d at 287, 290 (6th Cir.1997). However, this contract deals with attorney fees, which is an area otherwise subject to regulation. The pertinent regulatory rule in this instance is Michigan Rule of Professional Conduct (M.R.P.C.) 1.5(e), which states:

A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the client is advised of and does not object to the participation of all lawyers involved, and

(2) the total fee is reasonable.

M.R.P.C. 1.5(e) (West 2002).

Harrison and Keane agree that client consent is required to validate an agreement to pay a referral fee, but contend that the time when the client's consent must be given is not at the outset of the representation when the referral agreement is made, but at the conclusion, immediately before payment of the referral fee. They say, therefore, that the statements of Jeanne Cothran and Kimberly Idalski, both individually and in their capacity as fiduciaries of the respective estates, that they do not want any portion of the contingent fee in these cases paid to Lewis effectively negates the referral fee agreement.

It is undisputed that the plaintiffs were advised of the fee referral arrangement (which was in writing), they consented to it, and the total fee was reasonable. The plain language of M.R.P.C. 1.5(e) requires advice to the client regarding the lawyers who are participating. The fee division is allowed if the client does not object to this participation. The rule does not specify when objections to a lawyer's participation must be lodged. Nor does the interpretive ethics opinion provide guidance on this issue; rather, pointing to other ethics rules, the opinion focuses on the type of advice that must be given by both the referring and receiving lawyer, such as

"who will be working on the case, what services each lawyer will render to the client, and who is responsible for the matter." Mich. Eth. Op. RI–234, at 2 (1995).

Since a fee agreement is a contract, obligations became fixed once there was a meeting of the minds. *See Port Huron Ed. Assoc. v. Port Huron Area School Dist.,* 452 Mich. 309, 326–27, 550 N.W.2d 228, 238–39 (1996) (binding contract created when there is meeting of the minds; meeting of the minds likewise required to modify or cancel contract); *Groulx v. Carlson,* 176 Mich.App. 484, 491, 440 N.W.2d 644, 648 (1989). To allow subsequent events, such as a mere change of heart, to upset the referral arrangement is inconsistent with basic contract law. *Port Huron Ed. Assoc.,* 452 Mich. at 326–27, 550 N.W.2d at 238–39. Further, it would be unwise as a matter of policy to permit a client by whim or fancy, or perhaps more nefarious motives, to undo a referral contract after the lawyers' work is finished but before final payment. As the Michigan Grievance Administrator observed, "[i]t is easy to conjecture situations where the attorney to whom a case has been referred colludes with the client to deprive the referring attorney of the benefit of his bargain, and later splits the referral fee." Br. of Atty. Grievance Comm., at 2. The Court concludes, therefore, that client consent to a referral agreement is required only at the time the referral agreement is made and not also immediately prior to payment.

However, even a facially valid contract is voidable if it is induced by fraud. *Samuel D. Begola Servs., Inc. v. Wild Bros.,* 210 Mich.App. 636, 640, 534 N.W.2d 217, 219 (1995). Fraudulent inducement is established by proof that (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, he knew it was false or made it recklessly without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that another person would act on it; (5) the other persons acted in reliance on it; and (6) the persons suffered damages as a result. *Hi–Way Motor Co. v. Int'l Harvester Co.,* 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976).

In this case, there is no question that Lewis lied to his clients about the commingled funds. Lewis had a duty to inform his clients of his conduct. *Kukla v. Perry,* 361 Mich. 311, 316, 105 N.W.2d 176, 178 (1960) ("The attorney not only has duties of care and professional skill, but he must also conduct himself in a spirit of loyalty to his client, assuming a position of the highest trust and confidence. In addition to this, in all dealings between the attorney and the client, the burden is upon the attorney to show full information and freedom from restraint on the part of the client.") The false representation element "may be satisfied by the failure to divulge a fact or facts the defendant has a duty to disclose." *Clement–Rowe v. Mich. Health Care Corp.,* 212 Mich.App. 503, 508, 538 N.W.2d 20, 23 (1995). More directly, according to Lewis' own testimony, he told Donald Cothran shortly after the April 5, 1999 embezzlement charge that the funds which Lewis had already spent were "secure" and invested in real estate. Dep. of Thomas R. Lewis, 2/16/01 at 74. These representations were, of course, false.

The misrepresentations were material as well. It is true that false statements regarding the status of the stolen funds had little to do with participation of the lawyers involved or the reasonableness of the total fee. However, Lewis' statements which prevented his clients from learning the true facts concerning his defalcations were necessary to prevent them from firing him outright, which would have left

him with no case to refer. In other words, the lie was necessary to preserve for him the possibility to personally profit from the cases.

Moreover, Lewis' relationship with the estates and their representatives was that of a fiduciary. *Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.,* 107 Mich.App. 509, 515, 309 N.W.2d 645, 648 (1981) (holding that an attorney-client relationship is a *per se* fiduciary relationship). In *Street v. J.C. Bradford & Company,* 886 F.2d 1472 (6th Cir.1989), the court of appeals held that a contract between a fiduciary and beneficiary is voidable by the beneficiary unless the contract is objectively fair and "all parties beneficially interested manifest assent with full understanding of their legal rights and *of all relevant facts that the fiduciary knows or should know." Id.* at 1481 (quoting Rest.2d Contracts § 173) (emphasis added). Lewis not only failed to disclose relevant facts; he concealed them.

The plaintiffs here have testified that had they known of Lewis' misconduct, they "would have fired him as [their] attorney immediately." July 1, 2000 Statement of Jeanne and Donald Cothran and Kimberly Idalski. They would not have consented to the referral arrangement which, in effect, would have permitted Lewis to use their own money (i.e., the lawsuit proceeds) to pay them back. Although Jeanne Cothran and Kimberly Idalski do not have an absolute right to object to the payment of the referral fee once a valid referral agreement is made, the Court finds that they were fraudulently induced to consent to the referral arrangement. The referral agreement is voidable and, since Jeanne Cothran and Kimberly Idalski seek now to avoid it, it will not be enforced.

## B.

■ Lewis also argues that even if the referral agreement is not enforced, he is nonetheless entitled to a portion of the attorney fee based on the work the he did to advance the plaintiffs' claims under *quantum meruit,* his subsequent disbarment notwithstanding. He relies on Mich. Ct. R. 9.119(F), which states:

> An attorney whose license is revoked or suspended, or who is transferred to inactive status pursuant to MCR 9.121 may not share in any legal fees for legal services performed by another attorney during the period of disqualification from the practice of law. A disbarred, suspended, or inactive attorney may be compensated on a *quantum meruit* basis for legal services rendered and expenses paid by him or her prior to the effective date of the revocation, suspension, or transfer to inactive status.

*Quantum meruit* is an equitable doctrine generally applied to prevent unjust enrichment. The term literally means "as much as he has deserved." *Reisenfeld & Co. v. Network Group, Inc.,* 277 F.3d 856, 862 n. 1 (6th Cir.2002) (quoting *Black's Law Dictionary* 1255 (7th ed.1999)). The plaintiffs, Harrison and Keane contend that Lewis' misconduct disqualifies him from receiving any portion of the attorney fee generated by this lawsuit.

Lewis has acknowledged that he commingled the plaintiffs' funds with his own, and at his deposition he reluctantly agreed that his actions violated the Michigan Rules of Professional Conduct. However, he takes the position with this Court, through his attorney, that his misconduct in stealing his clients' funds is "severable" from the work he did on the case which generated the contingent fee, and therefore, he reasons, he may still recover for the value of his work.

It is true that in *Rippey v. Wilson,* 280 Mich. 233, 273 N.W. 552 (1937), which Lewis cites in support of his claim, the Michigan Supreme Court held that where

an attorney's services are severable, misconduct in one phase of representation does not forfeit fees as to another phase of representation. *Id.* at 243, 273 N.W. at 555. In that case, the plaintiffs were patent attorneys who provided legal representation to the defendant in securing several patents. They also represented the defendant in negotiating with a third party who had made loans to the defendant and also sought to use the defendant's patented technology. The plaintiffs discontinued their representation of the defendant in his dealings with the third party, forcing the defendant to settle the dispute. The plaintiffs then sued to collect outstanding fees in connection with their patent work, but the defendant claimed that the defendants forfeited their right to fees when they improperly refused to continue representing him. The court held that the plaintiffs wrongfully withdrew their representation of the defendant, concluding that "[a]n attorney may lose his right to fees for unprofessional conduct or abandonment of his client's case. But we find no authority that where the services are severable, misconduct as to one phase forfeits fees as to another. Such a rule would be generally unfair and is contrary to the authorities." *Id.* at 245, 273 N.W. at 556.

However, the Court finds that a more complete statement of the applicable law in this area is found in *Polen v. Melonakos,* 222 Mich.App. 20, 564 N.W.2d 467 (1997), in which a law firm that withdrew early from representing the plaintiff in a medical malpractice case sought a portion of the contingent fee on a *quantum meruit* basis from the lawyers who eventually concluded a settlement. The court discussed three different circumstances in which an attorney typically requests a portion of a fee on the theory of *quantum meruit.* The first involves a client who wrongfully terminates an attorney or an attorney who rightfully withdraws from a matter. The court determined that a *quantum meruit*

portion of the fee is appropriate under this circumstance. *Id.* at 24, 564 N.W.2d at 470. In the second situation, an attorney is terminated by the client for cause but has not engaged in disciplinable misconduct prejudicial to the client's case or contrary to public policy. The case before the court fit that pattern, and the court determined that, under those circumstances, the attorneys were entitled to a *quantum meruit* portion of the fee. *Id.* at 27, 564 N.W.2d at 471. In the third situation, the attorney engages in conduct contrary to public policy or which amounts to an ethical violation. The court determined *quantum meruit* recovery of fees is not available under those circumstances. *Id.* at 26, 564 N.W.2d at 470.

In analyzing the third circumstance, the court considered three separate cases: *Hightower v. Detroit Edison Co.,* 262 Mich. 1, 247 N.W. 97 (1933), *Rippey v. Wilson, supra,* and *Kukla v. Perry, supra. Hightower* involved an attorney-client relationship established through inappropriate solicitation of an accident victim by a middleman. The *Hightower* court denied *quantum meruit* recovery to the attorney on the basis that "the judgment of the court will not be given in aid of or to encourage unprofessional conduct infringing the integrity of judicial proceedings." *Polen,* 222 Mich.App. at 26, 564 N.W.2d at 470. In *Kukla v. Perry,* the attorney, through a series of insider transactions, ended up as the controlling shareholder of his client's corporation, with ownership of the corporation's physical property and the client's real property. The *Kukla* court stated, "[t]he conduct of [the attorney] in this matter did not measure up to the standard required of an attorney toward his client. By such conduct, an attorney may lose his right to any fee." *Ibid.* Finally, the court of appeals distinguished the *Rippey* case by observing that, although *Rippey* awarded the attorneys a fee under

*quantum meruit*, the court still held that "an attorney may lose his right to fees for unprofessional conduct," and the court reduced the amount of attorney fees in that case to cover only services that "produced definite valuable results to plaintiff." *Ibid.* The *Polen* court concluded by stating:

> These cases indicate that quantum meruit recovery of attorney fees is barred when an attorney engages in misconduct that results in representation that falls below the standard required of an attorney (e.g., disciplinable misconduct under the Michigan Rules of Professional Conduct) or when such recovery would otherwise be contrary to public policy.

*Ibid.*

In this case, it is clear that Lewis' conduct places him in the third category. His attempt to "sever" his misconduct from his representation of the plaintiffs is artificial. The money he embezzled from the estates came from first-party and life insurance proceeds, which he says were unrelated to the third-party damage lawsuit. Yet these proceeds represented compensation for accident-related damages. Lewis signed fee agreements with Lori Cothran's Estate and Kaleb Cothran in which he promised to represent them "in connection with any and all claims of damages or compensation which may arise out of [the] accident." Contingent Fee Agreements, May 13, 1997. All the money represented damage recovery, albeit from different funding sources. The injuries for which damages were paid, both from first-party and third-party sources, arose from a common occurrence.

The Michigan Court of Appeals recently confirmed that the Michigan Rules of Professional Conduct play a major role in determining the validity and enforceability of attorney fee agreements. *Evans & Luptak v. Lizza*, 251 Mich.App. 187, 650 N.W.2d 364 (2002). In that case, the court rejected the argument that the M.R.P.C.

are rules for discipline only and cannot evidence public policy. Rather, the court held that the M.R.P.C. *establish* the state's public policy, and contracts which contravene them will not be enforced. *Id.* at 196, 650 N.W.2d at 370.

> We do not accept the contention that an attorney can receive fees for representation which from the outset gives the appearance of impropriety and is violative of established rules of professional conduct. An attorney may not recover for services rendered if those service are rendered in contradiction to the requirements of professional responsibility and inconsistent with the character of the profession.

*Ibid.* (quoting *In re Estate of Watson*, 5 Neb.App. 184, 557 N.W.2d 38 (1996)).

Despite these ethical concerns, Lewis argues, in conjunction with the derivative claimants, that the referral fee he seeks will be used to compensate the victims of his embezzlement, that he personally will never see a dime of it, that to rule against him will create a windfall for Harrison and Keane while, ironically, depriving the estates of a source from which to recover their stolen proceeds. All of that may be true, and the creation of a victim compensation fund may be a worthy undertaking. But to reach that point, the Court must pass through very sordid territory, turning a blind eye to avaricious and contumacious conduct which has added to the obloquy with which others already hold our noble profession. Mr. Lewis stole money from clients who sought legal help in coping with tragedy. He now seeks to partake in the reward reserved for those who act with "the punctilio of an honor the most sensitive." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928). His attempt to enlist a Court of the United States in his endeavor must be, and is, emphatically rejected.

## IV.

The Court finds that Thomas Lewis is entitled to no portion of the attorney fee previously approved by Judge Roberts. The Court's disposition makes it unnecessary to address the third issue briefed by the parties.

Accordingly, it is **ORDERED** that Thomas R. Lewis' motion for distribution of a portion of the attorney fee [dkt (99–10265) # 88] is **DENIED.**

It is further **ORDERED** that Roger Voss' Motion to Set Aside and Vacate the Order Determining the Existence of Attorney's Lien and for Sanctions pursuant to Fed. R. Civ. Proc. 60(b) [dkt (99–10265) # 95, dkt (99–10330) # 53] is **DENIED.**

It is further **ORDERED** that Bank One's Motion Asserting Claim [dkt (99–10265) # 97, dkt (99–10330) # 55] is **DENIED.**

It is further **ORDERED** that the Motion for Distribution of Escrowed Funds to Client Victims [dkt (99–10265) # 98] is **DENIED.**

It is further **ORDERED** that Timothy and Susan Fitzpatrick's Motion to Intervene as of Right pursuant to Fed. Rule Civ. Proc. 24(a) [dkt (99–10265) # 103, dkt (99–10330) # 57] is **DENIED.**

It is further **ORDERED** that Robert Agacinski's Motion to Vacate Court's Order of August 15, 2000 Determining Existence of Attorney's Lien, and to Direct Payment of Referral Fees into Receivership Account [dkt (99–10265) # 104, dkt (99–10330) # 58] is **DENIED.**

It is further **ORDERED** that the Estate of Kaleb Cothran's Motion to Vacate Order Entered on August 15, 2000 [dkt (99–10265) # 132–2] is **DENIED.**

It is further **ORDERED** that the Clerk of the Court shall disburse to Robert Harrison and Christopher Keane, jointly, the funds on deposit pursuant to the previous order of the Court [dkt (99–10265) # 85].

It is further **ORDERED** that the order for disbursement of funds is stayed until October 23, 2002 to permit any party aggrieved by this order to seek relief from the United States Court of Appeals for the Sixth Circuit. Disbursement shall be made immediately thereafter unless a stay is granted or extended by the court of appeals.